2004 VT 109

# In re Grievance of Leslie Brown

[865 A.2d 402]

No. 02-460

Present: Amestoy, C.J.,[1] Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned

Opinion Filed October 22, 2004

[1] Chief Justice Amestoy sat for oral argument but did not participate in this decision.

*Michael P. Casey*, Associate General Counsel, Vermont State Employees' Association, Montpelier, for Appellant Cross-Appellee.

*William H. Sorrell*, Attorney General, and *William B. Reynolds*, Assistant Attorney General, Montpelier, for Appellee Cross-Appellant.

¶ 1. **Dooley, J.** This is an appeal from an order of the Vermont Labor Relations Board (the Board), dated September 12, 2002, denying grievant Leslie Brown's request that a Board order made on October 24, 2001, reinstating grievant and awarding him back pay be modified to include lost overtime wages. The State of Vermont Agency of Transportation (VAT) cross-appeals the order claiming the Board abused its discretion when it reinstated grievant because the Board's determination that grievant's dismissal was not justified was unsupported by the record. As to the September 2002 order, we reverse and remand; as to the October 2001 order, we affirm.

¶ 2. Prior to his dismissal, grievant had worked for the State of Vermont for over thirty years. He began his career as a summer worker in 1968 and worked in various positions, with increasing responsibility, over the next twenty-four years. In 1992, grievant was promoted to transportation area maintenance supervisor in District 9, a position he occupied until his dismissal.

¶ 3. VAT employees, such as grievant, are subject to VAT's work rules. Relevant here, section four prohibits employees from using state equipment or tools for any purpose other than state-related work. As a matter of practice, however, District 9 employees did not follow this rule, and it was common for employees to borrow state tools and equipment for personal use.

¶ 4. In May and June 1999, grievant took a two-month leave from work to build a new house and garage. During this time, he borrowed a state-owned tamper. In May 1999, District 9 employees were performing work where a tamper was required. One of the employees was sent to grievant's home to retrieve the tamper. When the employee told grievant the tamper was needed for state work, grievant told the employee he should go rent a tamper. The employee then contacted grievant's supervisor who stated that if VAT was forced to rent a tamper, grievant would be responsible for the expense. Grievant subsequently relinquished the tamper.

¶ 5. When grievant returned to work in July 1999, he met with two of his supervisors. The supervisors informed him that he had to ask permission before he borrowed state-owned equipment, but if he did so it would not be a problem. Prior to this meeting, grievant was unaware he had to ask permission before borrowing state equipment. Shortly after this meeting, grievant took state equipment for use on his home without asking permission. The supervisors again met with grievant and told him he must stop borrowing state equipment without asking permission. Grievant explained that he thought that if the equipment was under his supervision, he did not have to ask permission. Grievant was informed this was not the case, and was told that he had been warned about this before and the next time it happened things would be handled differently.

¶ 6. In the ensuing months, grievant borrowed numerous pieces of state equipment without asking his supervisors' permission. By April 2000, grievant had the following state-owned equipment in his home: a nail gun, a chop saw, a ladder, two doors, an air compressor, a wood furnace, and one set of torch heads. He had many of these items in his possession for several months. He borrowed some of the equipment to complete the work on his house and garage, while he took other items home to repair for later use either by the state or an individual. In early April 2000, grievant's supervisors investigated a report that the above equipment was missing and in grievant's possession. On April 26, 2000, after concluding their investigation, grievant's supervisors filed a theft complaint with the Vermont State Police. A week later, a police officer went to grievant's home and informed him about the complaint. Grievant showed the officers the state equipment he had in his home and stated that he would return the items the following day. The next day grievant returned the items and then went to the police office where he was charged with grand larceny.

¶ 7. Following this incident, a state personnel administrator was assigned to investigate the allegations against grievant. In the administrator's report, which was submitted to the Human Resources Chief, the administrator concluded that grievant's actions should be viewed as "constituting gross misconduct, and rises to the level justifying that serious discipline or dismissal action are considered by the Agency." After receiving this report, the Human Resources Chief sent grievant a letter informing him that his actions constituted gross misconduct and that removal from state employment would be justified. The letter stated that grievant had "misappropriated state owned property for ... personal use" and listed the items found at grievant's home. The letter went on to say that on at least two occasions grievant "refused to follow direct and lawful instructions" given by his supervisors and that grievant "removed tools, equipment and material from state property with the purpose and intent to retain these items in [his] possession for [his] personal use." Following receipt of this letter, grievant and his Vermont State Employees Association (VSEA) representative met with the chief to discuss grievant's situation. After this meeting, the State dismissed grievant.

¶ 8. In relevant part, the termination letter stated:

> This letter is to notify you that you are terminated from your employment with the State of Vermont, for the reasons specified below and as outlined in my June 29, 2000 letter .... This action is taken after considering all aspects of your employment and taking into account factors including the nature of the job and the potential impact your continued presence can have on the State, public and your co-workers. It also takes into account your seniority with the State and the fact that you had full and clear knowledge of the seriousness of your misconduct. In my opinion, there is sufficient cause to warrant your dismissal.

Grievant was given two weeks' pay in lieu of notice.

¶ 9. Grievant then appealed his dismissal to the Board. The Board considered each item found in grievant's possession. With respect to each item, the Board found, contrary to the employer's finding, that while grievant took state property without asking permission, he did not do so with the intent to permanently deprive the state of this property. Although the Board found grievant's misconduct serious, it found it more significant that grievant "showed a disrespect for supervisory authority by disregarding instructions given to him on

more than one occasion by his supervisors." The Board also noted that it was common practice for District 9 employees to borrow state equipment for personal use and that grievant had a long and successful work history with VAT. Considering all these circumstances together, the Board concluded that the employer "inappropriately bypassed progressive discipline and just cause did not exist for Grievant's dismissal."

¶ 10. Consequently, the Board found that grievant should have received a thirty-day suspension and ordered that grievant be reinstated. The Board awarded grievant back pay, benefits, and interest "from the date commencing 30 working days from the effective date of his dismissal until his reinstatement, for all hours of his regularly assigned shift, minus any income (including unemployment compensation received and not paid back) received by Grievant in the interim." By its cross-appeal, VAT has appealed the Board's decision reinstating grievant. We begin with this issue.

¶ 11. VAT argues that the Board abused its discretion when it found that grievant did not misappropriate state property and ordered grievant reinstated. Specifically, VAT contends reversal is warranted because the Board erroneously concluded that the wood furnace found at grievant's home was not taken for personal use.

¶ 12. To dismiss a state employee, the employer must establish that just cause exists. "Just cause means some substantial shortcoming detrimental to the employer's interests, which the law and a sound public opinion recognize as a good cause for his dismissal." *In re Brooks*, 135 Vt. 563, 568, 382 A.2d 204, 207 (1977) (citations omitted). The burden of proof to establish just cause existed is on the employer, and that burden must be met by a preponderance of the evidence. See *In re Merrill*, 151 Vt. 270, 276, 559 A.2d 651, 654 (1988). The Board has routinely used the factors articulated in *In re Colleran*, 6 V.L.R.B. 235, 268-69 (1983), to determine whether dismissal is justified, and we have upheld the use of these factors. See, e.g., *Merrill*, 151 Vt. at 275, 559 A.2d at 654. In this case, the Board found the following factors pertinent under *Colleran*:

> 1) the nature and seriousness of the offenses and their relation to the grievant's duties and position, 2) the grievant's job level, including supervisory role, 3) the effect of the offenses upon other supervisors' confidence in the grievant's ability to perform assigned duties, 4) the clarity with which

the grievant was on notice of any rules that were violated in committing the offenses, 5) the grievant's past disciplinary record, 6) the grievant's past work record, 7) the consistency of the penalty with those imposed upon other employees for the same or similar offenses, 8) mitigating circumstances surrounding the offenses, 9) the potential for the grievant's rehabilitation, and 10) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future.

In reaching its decision, the Board relied upon the employer's failure to prove by a preponderance of evidence that grievant misappropriated state property, as well as the *Colleran* factors. It held that "the Employer inappropriately bypassed progressive discipline and just cause did not exist for Grievant's dismissal" and ordered grievant reinstated.

¶ 13. We treat the Board's conclusions with deference, *In re Madore*, 2003 VT 35, ¶ 7, 175 Vt. 510, 825 A.2d 12 (mem.), and do not overturn them when they are supported by the findings. *In re Robins*, 169 Vt. 377, 381, 737 A.2d 370, 373-74 (1999); *In re Towle*, 164 Vt. 145, 148, 665 A.2d 55, 58 (1995). In this case, VAT attempts to overcome the deferential standard of review by arguing that the Board's conclusion with respect to one of the property items — the furnace — is not supported by the findings or evidence.

¶ 14. It is clear that the Board was wholly unpersuaded by VAT's case with respect to the furnace. The Board found that the furnace had been used in the Westmore garage until the garage was replaced in the mid-1990's. When grievant and others attempted to put the furnace in the new garage, it smoked. An attempt to repair the furnace failed; it continued to emit smoke and separate at the seams. As a result, a new furnace was installed in the Westmore garage, and the old furnace was placed in the Coventry garage to be used as a supply of parts. In 2000, grievant was told to clean out the Coventry garage. He took home the furnace "to see if he could repair it for possible use by someone in a camp." VAT emphasizes this finding, which comes from grievant's testimony, and argues it is inconsistent with the Board's conclusion that grievant did not take "items of State property with the purpose and intent of retaining them in his possession for personal use."

¶ 15. We do not find that VAT has demonstrated the inconsistency it argues. The Board found that grievant, as a Transportation Area Maintenance Supervisor, had the authority to deem an item as

junk and move it to a junk pile. He could dispose of items in a scrap pile without further permission. When grievant was instructed to clean out the garage containing the old furnace, he could deem it junk. The Board specifically found that the furnace was "so damaged as to be useless to the State." The fact that through substantial amounts of his own time grievant could find some value in the old furnace does not change its characterization with respect to VAT, which was unwilling to allocate the personnel time to create the value.

¶ 16. In reaching this conclusion, we are unpersuaded by VAT's argument that the issue is controlled by our decisions in *In re Carlson*, 140 Vt. 555, 442 A.2d 57 (1982), and *In re Graves*, 147 Vt. 519, 520 A.2d 999 (1986). In *In re Carlson*, we overturned a Board decision reinstating an employee who had committed six acts of dishonesty. 140 Vt. at 557, 442 A.2d at 58. We rejected the Board's justification that "grievant obtained minimal personal profit" because others received most of the benefit from grievant's misconduct. We relied instead on the fact that the employee "defrauded substantial amounts from the State." *Id.* at 559, 442 A.2d at 59. Here, the Board could not find that grievant defrauded VAT with respect to the furnace, or that the furnace had any value in the possession of VAT.

¶ 17. Similarly, we do not find *Graves* controlling. In that case, the employee was terminated for routinely seeking reimbursement of meal costs in excess of what he actually paid. The State proved false reimbursement claims of $12.69, and grievant argued that the amount was de minimus. In affirming a Board decision upholding the termination, we rejected the argument "because the honesty an employer is entitled to expect of employees cannot and should not be measured in monetary terms." 147 Vt. at 524, 520 A.2d at 1002. Again, this case is distinguishable because the Board did not find that grievant defrauded VAT of any amount.

¶ 18. Finally on this point, we are unpersuaded by VAT's argument, made in its reply brief, that the Board substituted its judgment for VAT in determining the discipline to be imposed and, as a result, overstepped the limitations on its power as explained in *In re Gorruso*, 150 Vt. 139, 145, 549 A.2d 631, 635 (1988). In fact, the circumstances of this case create exactly the situation where the Board is within its power to impose a lesser disciplinary sanction. The Board found just cause for discipline, but not on grounds as serious as those alleged by VAT, and thus necessarily concluded "there was no just cause for the choice of discipline imposed by the State." *Id.* In these circumstances

*Gorruso* explicitly authorizes the Board to fashion its own disciplinary sanction within those allowed by the contract.

¶ 19. We now turn to the back pay issue raised in grievant's appeal. After the Board issued its reinstatement order, the parties disagreed on how to calculate back pay, specifically on whether lost overtime wages should be included in grievant's award. The Board resolved the dispute in a supplementary order issued in September of 2002, based generally on stipulated facts submitted by the parties. The order found that back pay awards "should be limited to the amount necessary to make the employee 'whole'" and that the Board's precedent was not to include overtime wages "because it is not predictable and not part of the regular workweek." The Board noted that overtime has been included in back pay awards, but only if "the amount of overtime is predictable and part of the employee's regular schedule." In this case, the Board found the amount of overtime grievant would have worked during his dismissal period was unpredictable because it "depended on the vagaries of the weather, determinations whether to require overtime, and Grievant's use of scheduled leave and sick time." Accordingly, the Board denied grievant's request and found that because the award did not include overtime wages, overtime wages grievant earned working at other employment during his dismissal period should not be deducted from his back pay award. The Board ordered that grievant's back pay award be "based on the amount of his non-overtime hours in his employment with the Employer, any deductions to his back pay award based on wages he earned in interim employment should be limited to non-overtime hours."

¶ 20. As we set out above, we accord the Board with deference. We presume that its decision was correct and reasonable, and consider only whether "the findings of fact taken as a whole justify the Board's ultimate conclusion." *In re AFSCME, Local 490*, 153 Vt. 318, 321, 571 A.2d 63, 65 (1989).

¶ 21. On appeal, grievant argues that the Board abused its discretion and committed reversible error when it ordered his award be based solely on nonovertime hours. The facts bearing on the issue are largely undisputed.[2] In the three years prior to grievant's dismissal he

---

[2] The parties stipulated to the accuracy of documents that showed how much overtime grievant worked in each of the two-week pay periods in the three years preceding his termination, how much overtime grievant's replacement worked in the eighteen months after grievant was fired and how much overtime was worked by other District 9 area supervisors in fiscal years 1999, 2000 and 2001. VAT objected to the introduction of the

consistently worked overtime, particularly in the winter months. After grievant was dismissed, his replacement worked overtime hours, consistent with grievant's overtime history. All maintenance supervisors worked significant amounts of overtime from 1999 to 2001, and these wages represented a substantial part of their overall compensation. For example, in the three years prior to grievant's dismissal, approximately twenty-two percent of grievant's entire compensation came from overtime wages.

¶ 22. The Board acknowledges that grievant would have worked overtime if he had not been discharged, but denied overtime compensation because it was not part of grievant's regular schedule and the specific amount was unpredictable. In stating the first rationale, the Board uses a very narrow definition of "regular." Maintenance workers regularly worked overtime in the winter when weather conditions, particularly ice and snow, required it. Ice and snow are a regular part of Vermont weather conditions in the Northeastern part of the state where grievant worked. The problem that gives rise to this appeal is that determining the number of overtime hours grievant would have worked during his dismissal period is difficult. Because methods exist to reliably estimate the number of overtime hours grievant would have worked, this reason does not support the Board's decision, even when we accord to that decision the deference our standard of review requires.

¶ 23. Whether overtime hours that are not part of an employee's regular work schedule can be included in a back pay award, if they are sufficiently predictable, is an issue of first impression for this Court.[3] We start from the premise that "[t]he purpose of back pay is to make

_____

documents on relevancy grounds, arguing that they were irrelevant because the precedents of the Labor Board denied overtime compensation irrespective of what the records showed.

[3] In *In re Lilly*, 173 Vt. 591, 595, 795 A.2d 1163, 1170 (2002) (mem.), we affirmed the Board's decision to award overtime pay where the time worked was "predictable and regularly scheduled." In *Lilly*, the Board awarded grievant overtime pay to a correctional officer. *Id.* The record in that case showed that correctional officers were required to arrive fifteen minutes early for roll call and were paid overtime for doing so. *Id.* On appeal, grievant asked this Court to include additional overtime hours in his award; we declined to do so because grievant "fail[ed] to identify what overtime pay he is entitled to receive and made no offer of proof to the Board from which it could have made a determination of entitlement." *Id.* Here, grievant has presented proof from which the Board could have determined he was entitled to lost overtime.

the grievant whole and place the grievant in the position he or she would have been absent a violation." *In re Whitney*, 168 Vt. 209, 216, 719 A.2d 875, 880 (1998). With that premise in mind, we consider first approaches taken by other jurisdictions.

¶ 24. The state courts that have considered this issue are split. Courts not including lost overtime wages have reasoned, as VAT contends here and the Board determined below, that overtime cannot be included because it is too speculative. See *Maggard v. Commonwealth*, 991 S.W.2d 659, 661 (Ky. Ct. App. 1998) (overtime not awarded because grievant was not vested with a legal right to work overtime and any overtime award would be based on speculation and conjecture); *White v. City of Boston*, 783 N.E.2d 467, 468-69 (Mass. App. Ct. 2003) (overtime not awarded because too speculative and grievant had a limited opportunity to work overtime); *James v. New Jersey State Prison*, 422 A.2d 786, 787 (N.J. Super. Ct. App. Div. 1980) (overtime not included in back pay award because too speculative). Courts including overtime in back pay awards have noted that although determining the exact amount of includable overtime is difficult, a grievant who can show, based on work history, that he or she regularly worked overtime in the past is entitled to compensation for lost overtime. For example, in *Elias v. Commonwealth*, 511 A.2d 887, 891 (Pa. Commw. Ct. 1986), the court, analogizing to contract damages, concluded that a doctor's lost overtime wages were includable: "[i]f he can demonstrate, based on past statistics, that he had actually taken advantage of [the right to work overtime], then in our view there is a sufficient basis to allow the award of overtime pay." See also *Colo. Civil Rights Comm'n v. ConAgra Flour Milling Co.*, 736 P.2d 842, 847 (Colo. Ct. App. 1987) (overtime awarded, "[a]lthough the amount of overtime pay awarded is an approximation, it is a reasonable estimate based upon [complainant's] prior overtime work schedule").

¶ 25. The two most comparable situations — wrongful termination of a private sector worker, and discriminatory discharge of a public or private sector worker — are not split and do generally award overtime. We explained the rule for calculating damages of a wrongfully terminated private sector worker in *Benoir v. Ethan Allen, Inc.*: "'The measure of damages for wrongful termination of an employment contract is the amount that the plaintiff would have earned absent the breach, less what he actually earned or could have earned by the exercise of reasonable diligence during the contract period after his termination.'" 147 Vt. 268, 272, 514 A.2d 716, 719 (1986) (quoting *Ashe v. Sunshine Broad. Corp.*, 412 N.E.2d 1142, 1145 (Ill. App. Ct. 1980)).

¶ 26. In *Benoir*, the employer argued that since it could raise or lower wages at any time, plaintiff's past work history was insufficient for calculating wages that might be due in the future. *Id.* The plaintiff

> introduced evidence to show that he was available for work, that there was work to be done at defendant's plant, and that he was unable to find alternative employment during this period. To establish the amount of his damages, he introduced evidence of his rate of pay at date of discharge and his gross wages for the two years prior to termination.

*Id.* The employer responded "that evidence of plaintiff's past wages is in no way relevant to what plaintiff would have earned if he had stayed on in the company's employ. Thus, according to defendant, the jury's award must be set aside as it is based on pure speculation." *Id.* We rejected that argument:

> "The general rule for determining damages is that the jury should estimate the amount within reasonable limits based upon the evidence before it." *Lemnah v. American Breeders Service, Inc.*, 144 Vt. 568, 580, 482 A.2d 700, 707 (1984). Thus, "if there is evidence from which an estimation may be made with reasonable certainty," a jury has the authority to make an assessment. *Id.*
>
> Evidence of plaintiff's past employment history, coupled with proof of the company's operating history during the post-discharge period, provided the jury with a conservative estimate of appellee's damages, but one which was clearly grounded in fact. Although plaintiff perhaps should have introduced evidence as to what a stock saw operator earned at defendant's plant during the period for which he sought damages, we can find no basis to reverse the jury's verdict on grounds of speculation or conjecture.

*Id.* at 272-73, 514 A.2d at 719. *Benoir* was recently applied in *Havill v. Woodstock Soapstone Co.*, 2004 VT 73, ¶ 44, 177 Vt. 297, 865 A.2d 335, where we held that a wrongfully terminated employee could recover reasonably anticipated bonuses that the employer was not contractually obligated to give. We reasoned that evidence of the employee's prior employment history and company practices sufficiently demonstrated that the employee would have received such bonuses, absent

the employer's wrongful discharge. *Benoir* and *Havill* are consistent with the law around the country. A wrongfully terminated employee is not limited to recovering only lost base salary, but may recover damages for other employment benefits lost as a result of termination. See, e.g., *Beaupre v. Cliff Smith & Assocs.*, 738 N.E.2d 753, 768 (Mass. App. Ct. 2000) (affirming the inclusion of raises in a back pay award); *Traighten v. Miller Bros. Indus., Inc.*, 437 N.Y.S.2d 101, 102 (App. Div. 1981) (awarding wrongfully terminated employee commissions that would have been earned under reasonable probabilities); *McDonald v. Chicago, Milwaukee, St. Paul & Pacific R.R.*, 157 N.W.2d 553, 558 (Wis. 1968) (instructing trial court to include evidence of possible lost retirement benefits on remand for damages in wrongful discharge).

¶ 27. Under the *Benoir* standard, the Board had enough evidence to estimate the lost overtime wages here. Just as the jury did in that case, the Board could have made a "conservative estimate" of grievant's damages. Indeed, grievant produced to the Board the evidence the employer said was missing in *Benoir* — the record of the earnings of grievant's replacement. *Benoir* answers the predictability objection raised by the Board in this case. *Havill* answers the regularity objection, as the Board has used the term; the bonus in *Havill* cannot be considered regular.

¶ 28. The second source of persuasive precedents is the federal decisions dealing with compensatory back pay awards. Federal courts considering this issue have overwhelmingly concluded that back pay awards should include overtime because this remedy comes closer to making the employee whole. See *United States v. City of Warren*, 138 F.3d 1083, 1097 (6th Cir. 1998) ("[L]ost overtime pay 'should be included in back pay,' and a district court must ensure that back pay awards 'completely redress the economic injury the claimant has suffered . . . .'") (quoting *Meadows v. Ford Motor Co.*, 510 F.2d 939, 947 (6th Cir. 1975), and *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 626 (6th Cir. 1983)); see also *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1562 (11th Cir. 1986). These cases typically arise under various anti-discrimination statutes, such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. § 626(b). Grievant relies heavily on Title VII cases that have included overtime components in back pay awards. VAT argues that these Title VII cases are inapplicable because under its scheme back pay is included in an award to deter unlawful discrimination by punishing the employer, and here

grievant has suffered no discrimination. We reject VAT's argument and conclude that grievant's reliance on these cases is entirely appropriate, since the federal statute's aim of deterrence is advanced in concert with the compensatory purpose.

¶ 29. Title VII's back pay provision has two purposes: "to make persons whole for injuries suffered" and to deter the employer from engaging in future discriminatory conduct. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975). Title VII's "make whole purpose" is integral to the statutory scheme, and the back pay provisions were modeled after the National Labor Relations Act as a model. *Id.* at 419. As its legislative history demonstrates, Title VII's make whole purpose stems from the notion that aggrieved employees should be able to recover for their economic injuries. This overarching policy consideration is the same as that present in this case, and in all wrongful discharge cases.

¶ 30. VAT has focused on the additional deterrence purpose and inappropriately conflated the concept of deterrence with punishment. In fact, in the Title VII context, making the employee whole is the deterrence. See *id.* at 417 ("If employers faced only the prospect of an injunctive order, they would have little incentive to shun practices of dubious legality."); *United States v. N.L. Indus.*, 479 F.2d 354, 379 (8th Cir. 1973) ("If backpay is consistently awarded, companies and unions will certainly find it in their best interest to remedy their employment procedures without court intervention . . . ."). When an employer is forced to compensate for back pay, it loses both the employee's services and the money that goes to compensate for those services. These consequences deter employers from breaking the law in the future, rather than punishing them for wrongful conduct in the past. Accordingly, Title VII's back pay provisions have been characterized as compensatory, rather than punitive. For example, in *Meadows*, 510 F.2d at 946, the Sixth Circuit Court of Appeals explicitly stated that overtime was included in the award to make the employees whole and not to punish the employer.

¶ 31. This purpose is further evidenced by the fact that an award of back pay under the Title VII scheme is not dependent on a showing of bad faith. *Albemarle*, 422 U.S. at 422. As the Supreme Court observed, "[i]f backpay were awardable only upon a showing of bad faith, the remedy would become a punishment for moral turpitude, rather than a compensation for workers' injuries." *Id.* Similarly, in *Robinson v. Lorillard Corp.*, 444 F.2d 791, 804 (4th Cir. 1971), a Title VII case, the

court stated, "back pay is not a penalty imposed as a sanction for moral turpitude; it is compensation for . . . tangible economic loss." Thus, the goal of courts in fashioning a back pay award under Title VII is identical to our goal in fashioning a back pay award in the context of a grievance under the State Employees Labor Relations Act. See *In re Whitney*, 168 Vt. at 216, 719 A.2d at 880 (stating that back pay awards should reflect actual damages).

■ ¶ 32. We see no difference between a federal back pay award that compensates for the economic impact of discriminatory conduct and our back pay award that compensates for the economic impact of conduct that violates the State Employees Labor Relations Act or the labor contract between the State and its employees. Further, there is nothing in the rationale for the federal decisions that supports a distinction between regular pay and overtime compensation. We follow the federal decisions and hold that where a grievant proves that he would have earned overtime compensation, but for the unlawful action of the State, a back pay award must ordinarily include a component for the lost overtime compensation.

¶ 33. Therefore, although we presume that the Board's decision is correct, we cannot conclude that the decision in this case properly implemented the policy behind back pay awards. The Board erred by not awarding at least some overtime compensation in this case. Consistent with *Benoir*, the Board should estimate the amount of overtime grievant would have worked "within reasonable limits" to determine a fair amount.

¶ 34. Courts that have included overtime compensation in back pay awards have generally calculated the overtime component in one of two ways: either based upon an average of the employee's previously-worked overtime or on the overtime of a similarly-situated employee. See *Ball v. U.S. Postal Service*, 53 Fed. Appx. 910, 912 (Fed. Cir. 2002) (under the Back Pay Act, 5 U.S.C. § 5596, overtime awards are calculated either based on the employee's prior overtime experience or considering a similarly situated employee); *Hill v. Airborne Freight Corp.*, 2003 WL 366641, at *1 (E.D.N.Y. 2003) (court used average weekly overtime totals to calculate award); *Colo. Civil Rights Comm'n*, 736 P.2d at 847 (overtime award based on overtime previously worked). Consistent with our deferential standard of review, which is based on the Board's expertise, it is preferable that the Board determine an appropriate policy for calculating the overtime compensation component of back pay awards in the first instance. This is a good case from which to derive a policy because of the wealth of

relevant evidence before the Board. In this case, the Board not only has evidence of grievant's overtime history, it also has evidence of the overtime history of grievant's replacement and all the other maintenance supervisors in grievant's district. The records provide evidentiary support for any method the Board may choose.

*The decision of the Vermont Labor Relations Board reinstating grievant and awarding him back pay is affirmed; the decision denying grievant overtime compensation as a component of back pay is reversed and remanded for further proceedings consistent with this opinion.*

¶ 35. **Skoglund, J.,** dissenting in part. I can agree with the majority that the Board's order of reinstatement can be affirmed. However, in light of the deference that is due to the Board, I cannot agree that the Board erred in declining to award overtime pay to grievant. This Court accords substantial deference to the Board in determinations that lie within its area of expertise and presumes its decisions are correct, valid, and reasonable. *In re Lilly*, 173 Vt. 591, 595, 795 A.2d 1163, 1170 (2002) (mem.). Most importantly, this Court will uphold the Board's findings so long as credible evidence fairly and reasonably supports them, even if we would not have reached the same decision. *In re Butler*, 166 Vt. 423, 425, 697 A.2d 659, 661 (1997). Such findings will stand even if there exists substantial evidence contrary to the challenged findings. *In re Brooks*, 135 Vt. 563, 567, 382 A.2d 204, 207 (1977). This Court will reverse only when the Board's decisions are clearly erroneous. *In re Merrill*, 151 Vt. 270, 273, 559 A.2d 651, 653 (1988). However, in this case, the majority presumes that the Board's decision is correct, but "cannot conclude that the decision . . . properly implemented the policy behind back pay awards," *ante,* ¶ 33, because it declined to award overtime compensation. That is to say, simply, we disagree with this result. The Court remands to the Board to determine "an appropriate policy for calculating the overtime compensation component of back pay awards," *ante,* ¶ 34 and to award same to this grievant. This is not deference.

¶ 36. I respectfully suggest that the Board has a well established policy on considering and calculating overtime compensation that comports with the policy of back pay awards: that is, back pay awards should be limited to the amount necessary to make the employee whole. See *In re Whitney*, 168 Vt. 209, 216, 719 A.2d 875, 880 (1998) (stating that purpose of back pay is to make grievant whole). For

example, in *In re Lilly*, this Court affirmed the Board's policy of limiting overtime compensation within the back pay remedy to those claims where the overtime is a predictable and regular part of the work week. 173 Vt. at 595, 795 A.2d at 1170. The Board's logic in utilizing the approach we affirmed in *In re Lilly* was well articulated in the Board's rejection of the grievant's claim here:

> We are not inclined to diverge from our longstanding precedents that overtime pay is not an appropriate part of a back pay award when it is not part of an employee's regular schedule and the specific amount of overtime is unpredictable. This results in denying Grievant's request that his back pay award include lost overtime wages. The amount of overtime Grievant would have worked is unpredictable. It depended on the vagaries of the weather, determinations whether to require overtime, and Grievant's use of scheduled leave and sick leave. The most appropriate measurement of the specific monetary losses suffered by Grievant is to base his back pay award on the wages he earned during his regular workweek.

¶ 37. The majority concludes that, because methods exist to reliably estimate the number of overtime hours grievant would have worked, the Board abused its discretion and committed reversible error when it based his award solely on nonovertime hours. In effect then, the Court is saying, we can figure it out, therefore you should have tried to do the same. I do not think that is our role or a part of proper appellate review.

¶ 38. In past cases spanning approximately two decades, the Board has addressed whether improperly dismissed employees are entitled to overtime compensation as part of a back pay award. The Board has held that back pay awards generally do not include overtime pay because it is not predictable and not part of the regular workweek. *In re Goddard*, 4 V.L.R.B. 189, 190 (1981). If the specific amount is predictable and part of the employee's regular schedule, the Board has concluded overtime pay is an appropriate remedy. *In re Lilly*, 23 V.L.R.B. 129, 130, 139 (2000), *aff'd*, 173 Vt. 591, 595, 795 A.2d 1163, 1170 (2002) (mem.) (noting that record showed that correctional officers were required to arrive fifteen minutes early for roll call and were paid overtime for doing so).

¶ 39. I do not disagree with the general premise offered by the majority in support of its to-be-determined award of overtime pay,

namely, that a wrongfully terminated employee may recover other employment benefits lost as a result of termination, such as an annual December bonus, *Havill v. Woodstock Soapstone Co.*, 2004 VT 73, ¶ 44, 177 Vt. 297, 865 A.2d 335, raises, *Beaupre v. Cliff Smith & Assocs.*, 738 N.E.2d 753, 768 (Mass. App. Ct. 2000), commissions that would have been earned under ordinary circumstances, *Traighten v. Miller Bros. Indus., Inc.*, 437 N.Y.S.2d 101, 102 (App. Div. 1981), or lost retirement benefits, *McDonald v. Chicago, Milwaukee, St. Paul & Pacific R.R.*, 157 N.W.2d 553, 558-59 (Wis. 1968). The propriety of including such other employment benefits in an award of back pay does not equate to a finding that the Board erred in not awarding an overtime component in this case.[4]

¶ 40. The majority acknowledges that the state courts are split on the issue. Courts that do not include lost overtime in their calculations of back pay conclude that the amount of overtime is too speculative and subject to conjecture. The majority relies on two cases wherein courts have included overtime in back pay awards. I suggest they provide weak support. In *Elias v. Commonwealth*, 511 A.2d 887, 891 (Pa. Commw. Ct. 1986), the commission held *as a matter of law* that overtime could not properly be awarded as part of back pay. The court corrected this misinterpretation and remanded for consideration of the same. *Id.* In *Colo. Civil Rights Comm'n v. ConAgra Flour Milling Co.*, 736 P.2d 842, 847 (Colo. Ct. App. 1987), the court held that, while overtime hours might be speculative, the commission had broad discretion in fashioning relief in cases of unfair discrimination. Which brings us to the cases from the federal bench relied upon by the majority.

¶ 41. In place of the Board's reasonable and long-standing policy with respect to the overtime remedy, the majority would install its preferred interpretation of "making the employee whole" by relying on Title VII and NLRB cases, which are predicated upon a much more significant public policy concern than any at stake here. As the United States Supreme Court observed in concluding that federal courts have

---

[4] In *Benoir v. Ethan Allen, Inc.*, 147 Vt. 268, 272, 514 A.2d 716, 719 (1986), the dispute was about the calculation of lost wages, and overtime was not part of the claim. The case stands for the simple proposition that if there is sufficient evidence from which an estimation of lost wages may be made with reasonable certainty, an assessment of damages can be made. The majority's reliance on this case in its discussion of other employment benefits is thus confusing.

significant discretion in fashioning the "make whole" remedy of Title VII, "[t]he power to award backpay cases was bestowed by Congress, as part of a complex legislative design directed at a historic evil of national proportions." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975).

¶ 42. Because "[b]ackpay has an obvious connection with this purpose," *id.* at 417, the back pay remedy, including overtime, which the majority of federal decisions have found to be an appropriate component of the remedy, is intended to serve the purpose of eradicating two historic institutional evils: unfair labor practices and employment discrimination. Thus, for example, in employment discrimination cases, back pay awards provide compensation for economic loss suffered by those who are discriminated against, and "more importantly . . . play a crucial role in the remedial process" by causing self-examination of employment practices and eliminating "so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history." *United States v. N.L. Indus.*, 479 F.2d 354, 379 (8th Cir. 1973).

¶ 43. The back pay/overtime jurisprudence of the federal courts is animated by remedies enacted by Congress to deal with "historic evils." In contrast, the Board's decisions implementing back pay remedies, of which overtime may be a part if predictable and regular, are intended to "correspond to specific monetary losses suffered" by a grievant. The Board's premise that an improperly dismissed employee may be made "whole" without resort to speculative calculations of overtime is entitled to deference. See *White v. City of Boston*, 783 N.E.2d 467, 468 (Mass. App. Ct. 2003) ("Compensation of a public employee for a period of unlawful separation from public employment does not require the government employer to presume that, based on averages, the employee would have earned a certain amount of extra duty [overtime] pay."). I would affirm the Board's order declining to award overtime pay.

¶ 44. To summarize, as justification for its decision in this case, the majority points to state cases that are distinguishable and, more importantly, that do no more than reaffirm the concept that the Board enjoys broad discretion in fashioning back pay awards. In addition, the majority attempts to analogize this case to Title VII cases, even though those cases arise out of a statutory scheme enacted by Congress in order to deal with "historic evils" and not simply to compensate employees. The majority's holding that the Board's decision did not properly implement the policy behind back pay awards

finds no support in the analysis presented and lacks substantial deference to the Board in determinations that lie within its area of expertise. *In re Lilly*, 173 Vt. at 592, 795 A.2d at 1167; see also *In re Sardi*, 170 Vt. 623, 626, 751 A.2d 772, 775 (2000) (mem.) ("We are reluctant to substitute our own judgment for that of the experience and expertise of a designated agency."). I dissent on the issue of back pay.

---

[1] Chief Justice Amestoy sat for oral argument but did not participate in this decision.