VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.        24-AP-402

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JUNE TERM,   2025

In re Grievance of Jonathan Stone\*        }        APPEALED FROM:
                                          }        Labor Relations Board
                                          }        CASE NO. 22-01

In the above-entitled cause, the Clerk will enter:

Grievant appeals the Vermont Labor Relations Board's decision upholding his termination from state employment.  We affirm.

The Board made the following findings in its decision.  In 2007, grievant was hired by the Department of Corrections (DOC) to work at Southern State Correctional Facility (SSCF) in Springfield, Vermont as a Correctional Officer I (COI).  COI is the lowest level of correctional officer.  Grievant was eventually promoted to Correctional Officer II (COII), then took a voluntary demotion.  In 2016 he was again promoted to COII.  During his fourteen years of service, grievant had served as acting supervisor and as second-in-command at SSCF.  Junior officers looked to grievant for guidance and relied on him to answer questions and provide information on how to safely handle situations in the facility.

The Board found that the culture at corrections facilities is different from most other work environments.  Correctional officers work under pressure and serve a population that often uses words and phrases that are unacceptable in most professional settings.  During the last two years of grievant's employment, correctional officers were working seventy to eighty or more hours per week due to COVID and staffing shortages.

In November 2020, a COI at SSCF heard grievant use the terms "faggot" and "wetback" during the roll call.  He did not know to whom the terms were directed.  He notified grievant's supervisor, who provided grievant with verbal feedback.

In December 2020, the SSCF superintendent initiated an investigation into an allegation that grievant made disparaging remarks in the workplace.  The investigation was precipitated in part by a resigning officer's report that he experienced a lack of training, culture of ostracizing new officers, and prolific use of homophobic language at SSCF.  During the investigation, grievant admitted to using the term "faggot."  He denied using the term to refer to someone's sexuality, asserting that it had taken the place of the word "bitch" as a derogatory term.

In early May 2021, grievant entered the main control room and made loud comments about someone being a "cunt." He was overheard by two COIIs as well as other staff members. Grievant repeated the term three or four times. One of the other COIIs asked grievant to stop using the term because there was a female present, but grievant immediately repeated it in his next sentence. A supervising officer asked the COIIs to write a report on the incident. Grievant admitted to using the term on that occasion. As a result of this incident, a second investigation was opened into grievant's behavior.

In August 2021, the acting commissioner of DOC notified grievant that it was contemplating serious disciplinary action against him including dismissal. The letter alleged that grievant committed misconduct or gross misconduct by repeatedly using vulgar, sexist, offensive, abusive, discriminatory, and homophobic words in the presence of others in the workplace. In addition to the incidents above, the letter alleged that grievant had referred to a new correctional officer who was openly gay as a "faggot" and a "fucking idiot." He frequently referred to others as "stupid," "retards," "fat fucks," and "cunts" and called a female employee a "fat cow." The letter alleged that grievant had violated sections 3.1 and 5.6 of the state employee personnel policy as well as DOC Work Rules 1, 6, and 9.

Section 3.1 of the state employee personnel policy prohibits discrimination and mistreatment based on sex and sexual orientation. Section 5.6 requires employees to conduct themselves in a way that will not discredit or embarrass the State and prohibits intimidation and harassment. Correctional officers receive sexual-harassment training at the beginning of their employment and on a yearly basis thereafter.

DOC Work Rule 1 prohibits employees from violating employee personnel policies and work rules. Work Rule 6 prohibits employees from engaging in verbal or physical behavior that is malicious, demeaning, harassing, or insulting. Work Rule 9 states that no employee shall comport themselves in a manner that reflects discredit upon DOC. Grievant signed the rules in April 2007.

Grievant admitted to using derogatory terms and profanity in the workplace, including the terms "faggot," "retard," and "cunt." He knew that the language was inappropriate and inconsistent with the sexual-harassment policy. He did not believe that his conduct was a problem because such language was prevalent throughout SSCF.

DOC Commissioner Nicholas Deml, who took office in November 2021, testified that when he began his tenure there was a toxic work environment at DOC's correctional facilities. He aimed to change this, in part because DOC was having difficulty retaining employees. He began to notify employees that such behavior was not acceptable and violated DOC rules and employee policies. In November 2021, Commissioner Deml notified grievant that he was terminated from his employment with DOC for the reasons listed in the August 2021 letter.

Grievant filed a grievance with the Labor Relations Board in December 2021. He alleged that he was terminated without just cause, DOC improperly bypassed progressive discipline, DOC did not consistently apply discipline to its employees, DOC unreasonably delayed imposing discipline, and his behavior did not constitute gross misconduct.

The Board held a hearing over two days in January and February 2023, following which it issued a written decision. The Board found that the State had proved by a preponderance of the evidence that grievant engaged in misconduct by repeatedly using vulgar, sexist, and homophobic epithets and slurs in the workplace. The Board concluded that grievant violated

sections 3.1 and 5.6 of the personnel policy as well as DOC Work Rules 1, 6, and 9. The Board weighed the factors set forth in In re Colleran, 6 V.L.R.B. 235 (1983), and concluded that DOC's decision to terminate grievant was reasonable. This appeal followed.

To terminate a state employee, the employer is required to prove by a preponderance of the evidence that just cause exists. In re Brown, 2004 VT 109, ¶ 12, 177 Vt. 365. "Just cause means some substantial shortcoming detrimental to the employer's interests, which the law and a sound public opinion recognize as a good cause for his dismissal." Id. (quotation omitted). We have approved the Board's use of the following factors, often referred to as the Colleran factors, to assess the reasonableness of a decision to terminate an employee:

> the nature and seriousness of the offense, the employee's job level and type of employment, the employee's past disciplinary record, the employee's work record, the effect of the offense on the employee's ability to perform satisfactorily, the consistency of the penalty with those imposed upon other similarly situated employees, the consistency of the penalty with any applicable agency table of penalties, the notoriety of the offense or its impact on the reputation of the agency, the clarity of notice, the potential for the employee's rehabilitation, mitigating circumstances surrounding the offense, and the adequacy and effectiveness of alternative sanctions to deter such conduct in the future.

In re Jewett, 2009 VT 67, ¶ 23, 186 Vt. 160. If the employer establishes that it "responsibly balanced the relevant factors in a particular case and struck a balance within tolerable limits of reasonableness, its penalty decision will be upheld" by the Board. Id. ¶ 24 (quotation omitted). On appeal, "[w]e treat the Board's conclusions with deference, and do not overturn them when they are supported by the findings." Brown, 2004 VT 109, ¶ 13 (citation omitted).

On appeal, grievant does not appear to directly challenge the Board's conclusion that he engaged in misconduct by violating the policies identified in its decision. Even if he did, we would see no error. Grievant admitted to frequently using slurs and profanity in the workplace, which he often directed toward other employees. This behavior clearly violated the personnel policy and DOC Work Rules. Grievant had notice, in the form of sexual-harassment training, the personnel policy and DOC Work Rules, and verbal feedback from a supervisor that his behavior was prohibited.

Grievant claims, however, that it was unreasonable for DOC to terminate him for his behavior. According to grievant, his use of profanity and slurs was merely "jail speak" and not serious in comparison to the prevailing culture within the facility. He argues that his work performance was otherwise satisfactory and that his supervisor did not think his language affected his ability to carry out his duties. Grievant claims that DOC's tolerance of similar conduct by other employees made it unclear what was allowed, he was the only person singled out for such conduct, and his conduct could have been easily corrected through appropriate counseling by a supervisor.

Grievant essentially asks us to reweigh the Colleran factors. That is not our role on appeal. See In re Vt. State Colls. Fac. Fed'n, AFT Loc. 3180, 2019 VT 50, ¶ 47, 210 Vt. 476 ("On appeal, it is not our role to reweigh the evidence."). Rather, our role is limited to reviewing whether the Board's conclusions are supported by its findings. Brown, 2004 VT 109, ¶ 13.

The Board considered each of the factors and found that they supported the reasonableness of the termination decision. Specifically, the Board found that grievant's sexist and homophobic language, which was frequently expressed in anger or frustration toward other correctional officers, was a serious offense. The ease and frequency with which grievant used slurs and profanities conveyed his negative and discriminatory attitudes toward women, homosexuals, and people with intellectual disabilities. Grievant was in a senior position but failed to serve as a positive role model for junior officers. He had been previously suspended for thirty days for failing to notify a shift supervisor about an incident involving the use of force against and search of an inmate. He had served DOC for fourteen years, but the length of his tenure did not outweigh the seriousness of his behavior. While grievant's direct supervisor still had confidence in him, the Commissioner and superintendent of SSCF had lost faith in grievant's ability to perform his job and serve as a model for other officers. Grievant's continued use of slurs and profanities undermined the Commissioner's goals of improving the work environment and attracting and maintaining new officers. Grievant had express and implied notice that his conduct could lead to termination in the form of sexual-harassment training, the personnel policy and Work Rules, and his supervisor's verbal warning. The Board found no evidence that DOC had treated grievant inconsistently with other employees who had committed similar offenses. Grievant did not acknowledge the problem with his language or accept responsibility for his behavior, instead blaming DOC. This indicated his potential for rehabilitation was limited. The Board found that grievant's PTSD diagnosis and the strains of working mandatory overtime did not mitigate his behavior. The testimony presented at the hearing by the State supports the Board's findings, which in turn support its conclusions. We therefore defer to its decision. Brown, 2004 VT 109, ¶ 13.

Grievant points to evidence showing that the use of profane and derogatory language at SSCF was widespread, arguing that this contradicts the Board's findings that his behavior was a serious offense. However, there was ample evidence showing that grievant's repeated and unapologetic use of profane and derogatory language towards and about fellow correctional officers violated DOC policies, shocked and intimidated other employees and made them feel unwelcome, and undermined DOC's goals of improving the work environment and retaining staff. Commissioner Deml testified that grievant's behavior was "so egregious and so outside the bounds of what is acceptable under our rules, both as a department, as a state, that . . . we felt it was definitely warranted" to bypass progressive discipline and dismiss grievant. That some conflicting evidence may exist is not a basis to reverse the Board's decision. See In re Lilly, 173 Vt. 591, 592 (2002) (mem.) (explaining that Board's findings will stand if supported by credible evidence, "even if there exists substantial evidence contrary to the challenged findings").

Grievant argues that the Board failed to address his complaint that DOC improperly bypassed progressive discipline or corrective action in terminating him. The DOC collective bargaining agreement provides that in misconduct cases, employees will be subject to progressive discipline, meaning that they will first receive an oral reprimand, followed by a written reprimand, suspension without pay, and finally, dismissal.[1] However, the agreement also provides that "there are appropriate cases that may warrant" DOC bypassing progressive discipline. While the Board did not expressly say so, its decision makes clear that it concluded DOC was warranted in bypassing progressive discipline and terminating grievant because it upheld the termination decision. The Board weighed the Colleran factors and the record

---

[1] The State argues that grievant did receive progressive discipline because he was suspended in 2019 for different conduct. However, DOC's representatives did not purport to have imposed progressive discipline at the Board hearing.

4

supports the Board's conclusion that DOC's action was reasonable. See In re Graves, 147 Vt. 519, 523 (1986) (affirming Board's decision upholding employer's decision to bypass progressive discipline and immediately dismiss employee who repeatedly submitted false reimbursement claims); In re Gorruso, 150 Vt. 139, 148 (1988) (holding seriousness of grievant's misconduct and lack of probability of him conforming his conduct to reasonable norms of behavior justified State's bypassing progressive discipline and dismissing grievant).

Grievant appears to argue that DOC was required to find "gross misconduct" to bypass progressive discipline. A review of the collective bargaining agreement reveals no such requirement. Rather, as explained above, the agreement expressly allows DOC to bypass progressive discipline in "appropriate cases," and its decision to do so here was supported by the record.

We reject grievant's claim that he was subjected to "double jeopardy" because in deciding to terminate him, DOC relied in part on the November 2020 incident, for which he had already received verbal feedback.[2] This argument fails because this is not a criminal prosecution to which the prohibition against double jeopardy applies. See, e.g., Donley v. Donley, 165 Vt. 619, 620 (1996) (mem.) (rejecting claim that issuance of abuse-prevention order based on incident for which defendant was acquitted of criminal charges placed him in double jeopardy because abuse-prevention proceeding was civil in nature). Grievant further claims that DOC was equitably estopped from punishing him a second time for the November 2020 incident. Grievant did not raise this specific claim below and therefore failed to preserve it for appeal. See In re Whitney, 168 Vt. 209, 215 (1998) (explaining that this Court will not address issue that party failed to raise before Board).

Finally, grievant argues that DOC implicitly waived its ability to enforce Work Rules 1, 6, and 9 by allowing the widespread use of profanity and slurs in corrections facilities by supervisors and correctional officers. In essence, grievant seeks to equitably estop DOC from relying on these rules as a basis for disciplining him. To prevail on his claim of equitable estoppel, grievant must show that (1) DOC knew the facts; (2) DOC intended that its conduct would be acted upon or acted in such a way that grievant had a right to believe its conduct was so intended; (3) grievant was ignorant of the true facts, and (4) grievant relied to his detriment on DOC's conduct. See Jones v. Dep't of Forests, Parks & Recreation, 2004 VT 49, ¶ 15, 177 Vt. 81 (listing elements of equitable estoppel). Estoppel against the government "is appropriate only when the injustice that would ensue from a failure to find an estoppel sufficiently outweighs any effect upon public interest or policy that would result from estopping the government in a particular case." In re Letourneau, 168 Vt. 539, 547 (1998) (quotation omitted).

Grievant's claim fails because he failed to show that he was ignorant of the true facts. As the Board found, grievant knew that his use of offensive derogatory language violated the sexual-harassment policy and DOC work rules. He also knew that DOC could enforce these rules because he received verbal feedback about his conduct. Moreover, even if grievant had established the elements of estoppel, he has failed to show that the injustice of failing to find an estoppel would outweigh DOC's interest in seeking to enforce its policies against sexual harassment and discrimination in the workplace. See In re Grundstein, 2018 VT 10, ¶ 27, 206 Vt. 575 (explaining that even if applicant "established the general elements of estoppel," exceptional circumstances which would justify estopping the State did not exist because "[a]ny

_____

[2] There was conflicting testimony as to whether the verbal feedback grievant received from his supervisor constituted an oral reprimand for purposes of progressive discipline.

injustice to applicant is outweighed by the significant public interest in ensuring that candidates for admission to the Vermont bar possess good moral character and fitness").

Affirmed.

BY THE COURT:

_____
Harold E. Eaton, Jr., Associate Justice

_____
Karen R. Carroll, Associate Justice

_____
Nancy J. Waples, Associate Justice