2014 VT 57

# In re Grievance of Christopher Spear

[99 A.3d 618]

No. 13-051

Present: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Crawford, Supr. J., Specially Assigned

Opinion Filed June 6, 2014

*Abigail A. Winters*, Associate General Counsel, Vermont State Employees' Association, Montpelier, for Appellant.

*William H. Sorrell*, Attorney General, and *Lindsay N. Browning*, Assistant Attorney General, Montpelier, for Appellee.

¶ 1. **Robinson, J.** At issue in this case is the pay due to a state employee pursuant to a collective bargaining agreement when the employee temporarily takes on duties at a higher level. Grievant Christopher Spear appeals a decision of the Vermont Labor Relations Board that the State, as grievant's employer, did not violate the nonmanagement unit collective bargaining agreement between the Vermont State Employees' Association (VSEA) and the employer when it provided grievant with "higher assignment pay" of a flat five percent of his regular pay rather than placing, or "slotting," him to a step in the pay grade associated with the higher assignment duties that was at least five percent higher than his regular pay. The Board found the agreement's provision governing higher-assignment pay ambiguous and concluded, based on the evidence presented, that the parties intended to calculate higher-assignment pay using a flat rate without slotting. We affirm.

I.

¶ 2. An understanding of the evolution of the terms of the nonmanagement bargaining unit collective bargaining agreement between the State as employer and the VSEA concerning pay for higher assignment work is helpful to understanding the issues in this case and the parties' arguments. Beginning with the collective bargaining agreement effective 1986 to 1988, the State adopted a Step Pay Plan to compensate nonmanagement employees. Under the plan, positions were assigned to specific pay grades. Within the pay grades, compensation levels were broken into discrete "steps." With limited exceptions, and subject to transitional provisions, employees were "slotted" on to steps within a particular pay grade and compensated accordingly. Within a pay grade

employees could advance to higher steps based on years of satisfactory service. The 1986-88 agreement also provided for "alternate rate pay" for employees required to take over a higher pay grade job due to the absence of an employee for a short period of time. Alternate rate pay was to be calculated as 108% of the employee's base rate, but could not be less than the minimum nor more than the maximum base rate for the position to which the employee was assigned. The agreement's provision for calculating alternate rate pay persisted essentially unchanged until the 1990-92 agreement.

¶ 3. In the 1990-92 agreement, a new provision in the salary article entitled "Rate After Promotion, Upward Reallocation or Reassignment" stated that employees would receive salary increases by being slotted on to the step of the new pay grade that would reflect an increase of at least eight percent over the salary rate prior to promotion. Alternate rate pay was replaced with "higher assignment pay," applicable when an employee was assigned to perform a majority of the duties of a higher level job substantially different from the duties of the employee's previous job or when an employee was assigned to a supervisory or managerial role without a change in duties. Higher-assignment pay was to be calculated as an eight percent differential in addition to the regular hourly rate, and in no event in excess of the maximum or less than the minimum of the pay grade of the higher-level position.

¶ 4. The provisions at issue in this appeal first appeared in their current form in the 1992-94 agreement. With respect to higher-assignment pay, the agreement stated: "the amount paid shall be a differential rate equal to the same rate as the 'rate on promotion' in the Salary article. In no case shall it exceed the maximum or be less than the minimum of the pay grade of the higher level position." The pertinent provision of the salary article, then Article 49, Section 10, provided:

> [U]pon promotion, upward reallocation, or reassignment of a position to a higher pay grade, an employee covered by this Agreement shall receive a salary increase by being slotted onto that step of the new pay grade which would reflect an increase of at least five percent (5%) over the salary rate prior to promotion (i.e. five percent is the lowest amount an employee will receive, and the

maximum amount would be governed according to placement on a step which might be higher than, but nearest to, the 5% minimum specified). The rate of 5% as outlined above shall be 8% if the employee is moving upwards three or more pay grades.

¶ 5. Both of these provisions remained substantially unchanged in the 2010-12 agreement.

## II.

¶ 6. With that background, we turn to the specific issue in this case. The Board's factual findings in this case are not in dispute. Grievant is a fire fighter with the State of Vermont Military Department in a pay grade twenty position. His employment is subject to the nonmanagement unit collective bargaining agreement between VSEA and the State, effective 2010 to 2012. Grievant was entitled to higher-assignment pay for work at pay grade twenty-two for August 5, 8, 11 and 14, 2011. The State compensated grievant with a flat five-percent increase of his normal wage for his higher assignment work. It did not "slot" grievant up to the next step in pay grade twenty-two that would result in an increase of at least five percent of his regular salary.

¶ 7. In April 2012, VSEA filed a grievance with the Board alleging that the State violated the collective bargaining agreement when it failed to slot grievant on to the appropriate step on the higher pay grade for the dates on which he was entitled to higher-assignment pay. The Board concluded that the State did not violate the agreement. Grievant appealed to this Court.

¶ 8. The issue on appeal concerns the Board's interpretation of the provision governing higher-assignment pay. As noted above, the higher-assignment-pay article in the 2010-12 agreement states that the "amount paid shall be a differential rate equal to the same rate as the 'rate on promotion' in the Salary article." The disagreement between the parties hinges on the meaning of the phrase "rate on promotion" in the higher-assignment-pay article as it relates to the salary article.

¶ 9. Grievant argues that the only reasonable interpretation of the agreement is that "rate on promotion" refers to the actual pay an employee would receive pursuant to the provision governing the rate of pay upon promotion — meaning the employee should be "slotted" at the appropriate step within the new pay grade —

either at least five percent or eight percent above the employee's pre-promotion rate of pay. Grievant contends that the plain language of the agreement provides that an employee should receive higher-assignment pay that is "equal to the same rate" as the employee would have received for an actual promotion to the new position. He argues that capping higher-assignment pay at a fixed-percentage rate (in this case, five percent) would ignore the requirement in the provision governing salary upon promotion that a promoted employee be slotted at a step "*at least* five percent" higher than the employee's pre-promotion pay. The parties could have, grievant posits, used a flat-rate percentage differential if they had so intended. Indeed, that is how the State calculated the "alternate pay rate" in place prior to the 1992 revisions to the agreement.

¶ 10. Employer argues that the parties to the agreement have always intended higher-assignment pay to be a flat-rate percentage without slotting. Employer explains that the salary article contains two pertinent components: (1) a description of the mechanics of the slotting process upon promotion, and (2) identification of the two potential minimum increases upon promotion — five and eight percent — and a description of the basis for determining which applies. Employer argues that the reference to "rate on promotion" in the higher-assignment-pay article refers only to the question of whether the five or eight percent increase applies, rather than to the overall process for determining an employee's pay upon promotion. Employer further argues that the requirement in the salary article that a pay increase be "at least" the applicable percentage increase — or the slotting requirement — refers to pay upon promotion, but does not apply to the higher-assignment pay provision.

¶ 11. A majority of the Board found that employer did not violate the collective bargaining agreement by calculating grievant's higher-assignment pay as a fixed-rate differential. The majority began with the threshold inquiry of whether the language controlling higher-assignment pay is ambiguous. It concluded that the provisions are capable of more than one reasonable interpretation — either, as grievant proposed, that higher-assignment pay is to be calculated by the same process as determining a promotional increase or, as the employer proposed, that "rate on promotion" refers to the five or eight percent increase upon promotion rather than the whole process, including slotting, that

applies to promotional pay calculations. Because the majority found the agreement's language sufficiently ambiguous, it considered evidence of the bargaining history and parties' past practice to discern the parties' intent. The majority concluded that the bargaining history was not dispositive because there had been no discussion as to the method of calculating higher-assignment pay. The parties' past practice, however, demonstrated that the employer has consistently applied a flat dollar amount differential without slotting. The majority noted that VSEA's chief negotiator knew of this practice, and no grievance had been filed to enforce a contrary reading of the agreement in the more than two decades that the language was in force. The majority therefore concluded that the parties intended to calculate higher-assignment pay by applying a flat five or eight percent increase without slotting.

¶ 12. One member of the Board dissented, arguing that the majority misapplied contract principles in finding the agreement ambiguous. According to the dissenting member, the salary article's language that promotional pay must be "at least" five or eight percent belies the State's interpretation that higher-assignment pay is calculated as a flat-rate differential. The dissenter further noted that a mistaken interpretation that has endured many years cannot justify denying employees rights to which they are expressly entitled under the collective bargaining agreement. Grievant appealed to this Court. The parties' arguments on appeal generally track their arguments below, and the majority and dissenting opinions of the Board.

## III.

¶ 13. ■ "Interpretations of collective bargaining agreements are within the particular expertise of the Board, and we review such interpretations with great deference to the Board's expertise." *In re Cole*, 2008 VT 58, ¶ 9, 184 Vt. 64, 954 A.2d 1307 (quotation omitted). We will uphold the Board's decision if the findings of fact, when viewed as a whole, support the Board's conclusions. *In re West*, 165 Vt. 445, 449, 685 A.2d 1099, 1102 (1996); see also *In re Jewett*, 2009 VT 67, ¶ 25, 186 Vt. 160, 978 A.2d 470 (stating that we will affirm the Board's conclusions if supported by the findings and will not disturb the Board's findings of fact unless clearly erroneous).

¶ 14. When interpreting a collective bargaining agreement, the goal is to discern the true intentions of the parties. See *In re Gorruso*, 150 Vt. 139, 143, 549 A.2d 631, 634 (1988) ("It is well established that it is the duty of judicial or quasi-judicial bodies to construe a contract so as to ascertain the true intention of the parties."). In construing particular provisions of a contract, we must consider them in relation to the contract as a whole in order to "give effect to all material parts of the contract and to form a harmonious result." *In re Stacey*, 138 Vt. 68, 72, 411 A.2d 1359, 1361-62 (1980). If the language of an agreement is clear and unambiguous, then it "must be given effect in accordance with its plain, ordinary and popular sense." *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 579, 556 A.2d 81, 85 (1988). If, on the other hand, the language is ambiguous, a court may consider extrinsic evidence in construing the contract. *Breslauer v. Fayston Sch. Dist.*, 163 Vt. 416, 425, 659 A.2d 1129, 1135 (1995).

¶ 15. The threshold question of whether contract language is ambiguous is a question of law. *Isbrandtsen*, 150 Vt. at 577, 556 A.2d at 83. When addressing the threshold question of whether ambiguity exists, a court may consider limited extrinsic evidence, including "the circumstances surrounding the making of the agreement as well as the object, nature and subject matter of the writing." *Cameron's Run, LLP v. Frohock*, 2010 VT 60, ¶ 20, 188 Vt. 610, 9 A.3d 664 (mem.); see also *Breslauer*, 163 Vt. at 425, 659 A.2d at 1135; *Isbrandtsen*, 150 Vt. at 577, 556 A.2d at 83. A contract may be ambiguous if the "writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable." *Isbrandtsen*, 150 Vt. at 579, 556 A.2d at 84.

¶ 16. With these precepts in mind, we first consider the Board's conclusion that the agreement is ambiguous, and that the contract language allows more than one reasonable interpretation. On its face, the contract supports the interpretation advocated by grievant. The provision relating to higher-assignment pay references "the same rate as the 'rate on promotion' in the Salary article," and the section in the salary article describing the slotting process upon promotion is titled, "Rate After Promotion." This could be read to suggest that the methodology for calculating higher-assignment pay is the same as the methodology for calculating pay upon promotion to the higher pay grade slot. The "rate"

referenced by the higher-assignment pay provision in this case would be the *rate of pay* after promotion. Had the parties intended to reference only the five or eight percent difference, without the slotting described in this provision, they would have said so. We cannot say that this interpretation is unreasonable.

¶ 17. But with respect to the minimum increase in pay upon promotion, the contract states within the provision concerning "Rate on Promotion" that "The rate of five percent (5%) as outlined above shall be eight percent (8%) if the employee is moving upwards three or more pay grades." This second reference to a "rate" does not refer to the actual rate of pay after promotion; but instead references the minimum five or eight percent *rate of increase* in pay available based on the number of pay grades through which the employee passes upward. The reference to "rate on promotion" in the salary article, the employer essentially argues, refers to this rate — the five or eight percent. Had the parties intended to provide for slotting in the higher-assignment-pay calculation, the employer argues, they would have said so. Especially considered in light of the circumstances surrounding the making of this agreement, we conclude that employer's understanding of the contract is also reasonable for several reasons. See *Isbrandtsen*, 150 Vt. at 579, 556 A.2d at 84 (stating that a contract may be ambiguous if the "writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable").

¶ 18. The evolution of the agreement supports the employer's interpretation. The calculation of an employee's pay upon promotion was subject to slotting *before* the 1992 contract. As the Board noted, the reference to the "rate on promotion" provision in the salary article was added to the higher-assignment-pay article at the time that the salary article was revised to include two potential percentage increases to be applied to promotional pay calculations — five or eight percent. It is entirely plausible, in light of the addition of this phrase in concert with the addition of two alternative percentage increase rates in the salary article, that the cross-reference from the higher-assignment-pay article was intended to capture that applicable percentage differential in a particular case rather than to incorporate the entire process for calculating promotional pay into the higher-assignment-pay article. Thus, even without considering extrinsic evidence beyond the

undisputed evolution of the collective bargaining agreement, we conclude that the contract is susceptible to two reasonable interpretations and is therefore ambiguous.

¶ 19. This conclusion is bolstered by the uncontradicted accounts of the circumstances surrounding the making of the agreement from individuals who were on *both* sides of the bargaining table at the time the higher-assignment-pay language was amended to reference the rate on promotion provision.[*] Annie Noonan, VSEA director since 1994 and chief negotiator for VSEA in all collective bargaining negotiations with the State from 1986 to 2008, stated that at the time the parties agreed to adopt the variable percentage increases, the higher-assignment-pay "differential of 8% was also changed to reflect the 'rate on promotion' in order to distinguish between the now different rates." Tom Ball, Director of Labor Relations at the Department of Human Resources since 1980, likewise stated that the "rate on promotion" language was added for the purpose of distinguishing between the five or eight percent increases.

¶ 20. Moreover, former VSEA director Noonan also stated that she had never discussed higher-assignment-pay calculation with the Department of Human Resources and that she did not recall any discussion during the negotiations surrounding the 1992-94 agreement about whether higher-assignment pay should include slotting. Director of Labor Relations Ball likewise testified that the parties did not discuss whether the calculation of higher-assignment pay should be changed from a fixed percentage to a slotted-up rate during the negotiations for the 1992 contract. Uncontradicted evidence from both sides of the negotiation that the parties did not discuss slotting up higher-assignment pay rather than continuing to use a fixed-percentage differential lends even further support to the conclusion that the terms of the agreement concerning higher-assignment pay are ambiguous. Had the parties intended to depart from their prior practice of applying a fixed-percentage increase in calculating higher-assignment.pay, or to enhance employee compensation by allowing a state employee assigned to a higher job level to realize a pay increase of more than the applicable percentage, they would likely have discussed the issue. The gratuitous extension of an

---

[*] The parties agreed to file written testimony and exhibits in lieu of an evidentiary hearing before the Board.

unbargained-for-benefit in collective bargaining negotiations is atypical. For all of these reasons, we concur with the Board that the contract provision at issue is ambiguous.

¶ 21. ■ ■ Given the ambiguity, the Board relied on extrinsic evidence to determine the parties' intention and concluded that the agreement was intended to provide only a percentage increase for higher-assignment pay without slotting. The Board's findings of fact are not clearly erroneous and its conclusion are well supported by its findings. *In re Brown*, 2004 VT 109, ¶ 13, 177 Vt. 365, 865 A.2d 402 ("We treat the Board's conclusions with deference, and do not overturn them when they are supported by the findings." (citation omitted)). Most significantly, the evidence noted above as bolstering the Board's conclusion that the agreement was ambiguous also supports the Board's resolution of that ambiguity. Uncontradicted witnesses from both sides of the negotiation agree that (1) they did not discuss the notion of slotting up higher-assignment pay when they added the reference to the "rate on promotion" to the higher-assignment-pay article, and (2) the reason they added that reference was to distinguish between the five or eight percent pay enhancements.

¶ 22. In addition, the Board found the parties' past practice helpful in interpreting the meaning of the contract language. In particular, the Board found that the employer has consistently calculated higher-assignment pay, both before and since the 1992-94 contract, as a flat differential, "based on the applicable five percent or eight percent increase applied to the employee's base rate of pay, without 'slotting up.' " The Board concluded, "If VSEA considered the Employer's practice to be contrary to the contract language, we would expect that this would have been voiced through a grievance or in contract negotiations much earlier than the two decades which elapsed before the grievance was filed in this case."

¶ 23. The Board's finding on this point is supported by the evidence. According to Mr. Ball and Ms. Noonan, both the State and VSEA had always understood higher-assignment pay to be calculated as a flat-percentage differential, without slotting. Mr. Ball also indicated that, since the inception of higher assignment pay, the State has "uniformly and consistently" calculated higher-assignment pay as a flat-rate differential based on the applicable five or eight percent increase without any slotting.

¶ 24. Further, it was reasonable for the Board to conclude that the fact that over twenty years have passed without any challenges to the State's interpretation of these provisions further supports its conclusion that the parties intended, at the time of negotiation, to continue to apply a fixed-percentage differential for higher-assignment pay under the agreement's new language. We note, however, that our affirmance does not rest solely or even primarily on the fact that neither the VSEA nor a state employee has apparently challenged the failure to slot up higher-assignment pay, since the current language was added in 1992. If the parties had contracted to provide for slotting up higher-assignment pay, the failure to enforce that agreement for a period of time would not change their agreement or act as some sort of waiver. The primary factors supporting the Board's analysis, both as to ambiguity and the parties' intentions, are the way the respective collective bargaining agreements, and the language at issue in this case, evolved, and the uncontradicted evidence that, at the time they negotiated the language, both the VSEA and the State understood the higher-assignment-pay provision to provide for a five or eight percent increase in pay without slotting.

*Affirmed.*

¶ 25. **Dooley, J.,** dissenting. The majority errs in finding ambiguity where none exists. There is only one reasonable interpretation of the contract language at issue in this case — the interpretation advanced by grievant. Grievant is plainly entitled to receive an increase in pay of "at least 5%" after being slotted into the appropriate step. I therefore dissent.

¶ 26. As the majority recognizes, our goal in interpreting contracts is to implement the parties' intent. *In re Adelphia Bus. Solutions of Vt., Inc.*, 2004 VT 82, ¶ 7, 177 Vt. 136, 861 A.2d 1078. We presume that the parties' intent "is reflected in the contract's language when that language is clear," *id.*, and clear language must be enforced according to its terms. *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 579, 556 A.2d 81, 84 (1988). We will find ambiguity only if "a writing *in and of itself* supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable." *Id.* (emphasis added). The question of whether an ambiguity exists is one of law, which we review de novo. *Id.* at 577, 556 A.2d at 83.

¶ 27. The language here is clear. With respect to higher assignment pay, the contract states: "[T]he amount paid shall be a differential rate equal to the same rate as the 'rate on promotion' in the Salary article. In no case shall it exceed the maximum or be less than the minimum of the pay grade of the higher level position." The relevant provision of the salary article provides:

> [U]pon promotion, upward reallocation, or reassignment of a position to a higher pay grade, an employee covered by this Agreement shall receive a salary increase by being slotted onto that step of the new pay grade which would reflect an increase of at least five percent (5%) over the salary rate prior to promotion (i.e., five percent (5%) is the lowest amount an employee will receive, and the maximum amount would be governed according to placement on a step which might be higher than, but nearest to, the five percent (5%) minimum specified). The rate of five percent (5%) as outlined above shall be 8% if the employee is moving upwards three or more pay grades.

¶ 28. This language plainly expresses the parties' intent that employees entitled to higher-assignment pay will receive pay equal to the same rate as the rate on promotion in the salary article. The salary article provides that the rate on promotion is the pay rate resulting when the employee is slotted into the step on the new pay grade that results in *at least* a five percent or eight percent increase over the employee's prior rate of pay.

¶ 29. The majority finds that employer proffers an equally reasonable construction of this language. According to employer, the phrase "rate on promotion" refers to a five percent or eight percent baseline "rate of increase" applicable upon promotion without slotting into a step on the higher level pay grade. Employer draws a distinction between the "rate on promotion" and the "process" of obtaining that rate upon promotion, and observes that the parties did not specifically state that both the rate and the process should apply in calculating higher-assignment pay. Employer maintains that the words "at least five percent" refer only to the process of promotion itself, and not the "baseline rate" applicable to higher-assignment pay.

¶ 30. The majority agrees that the reference to "rate on promotion" can be reasonably read to refer to a flat five or eight

percent "rate of increase." *Ante*, ¶ 16. It focuses on the reference in the second sentence of the salary article to "[t]he rate of five percent," or eight percent where applicable, and it appears to credit employer's assertion that if the parties had intended to provide for the slotting "process" in calculating higher-assignment pay, they would have said so. *Ante*, ¶ 16. The majority finds its conclusion supported by "the evolution of the agreement," and the circumstances surrounding the making of the agreement. *Ante*, ¶¶ 18-19.

¶ 31. The interpretation embraced by the majority finds no support whatsoever in the plain language of the contract. The contract does not distinguish between a "rate on promotion" and the process for achieving that rate, and we should not rewrite the parties' contract to create such an artificial distinction. The agreement provides for one "rate on promotion" — the rate achieved by slotting an employee into a higher pay grade that reflects an increase of *at least* five percent over the salary rate prior to promotion, or an increase of at least eight percent if the employee is moving upwards three or more pay grades.

¶ 32. The higher-assignment-pay provision similarly does not refer to a "baseline rate of increase," nor does the salary article recognize a distinct "baseline rate of increase." The majority ignores the actual words of the contract in finding that the salary article refers to a "rate of five percent." In fact, the agreement refers to the "rate of five percent (5%) *as outlined above.*" The words "as outlined above" directly refer to the slotting process described in the preceding sentence of the salary article. The relevant portion of the salary article is concerned only with the "rate on promotion," which is a variable rate based on "slotting up." Five percent (or eight percent) is the "lowest amount" an employee could receive if a step were available at that precise level; otherwise, placement is on the step that is closest to, but not less than, a five percent (or eight percent) increase.

¶ 33. The majority cites "[t]he evolution of the agreement" as support for its conclusion that the disputed language is ambiguous. *Ante*, ¶ 18. It notes that the reference to the "rate on promotion" provision in the salary article was added to the higher-assignment-pay article at the time that the salary article was revised to include the five and eight percentage increases to be applied to promotional pay calculations. The majority deems it plausible that this "was intended to capture that applicable

percentage differential in a particular case rate rather than to incorporate the entire process for calculating promotional pay into the higher-assignment-pay article." *Ante*, ¶ 18.

¶ 34. I disagree that this evidence shows an ambiguity in the contract. We allow a limited inquiry into the circumstances surrounding the making of an agreement in inquiring into the existence of ambiguity. *Isbrandtsen*, 150 Vt. at 579, 556 A.2d at 84. For ambiguity to exist, a writing "in and of itself" must support "a different interpretation from that which appears when it is read in light of the surrounding circumstances," and both interpretations must be "reasonable." *Id.* Nothing in the written language of this contract supports the notion that a flat rate applies to higher-assignment pay, while a different rate applies to promotions. The contract clearly states that the rates are the same.

¶ 35. Rather than supporting the majority's interpretation, the surrounding circumstances support the enforcement of the language as written. As the dissenting Board member pointed out, the promotional and higher-assignment pay increases were both set at eight percent prior to the contract at issue. The changed language continued the identical treatment by converting straight percentage increases in both cases to the pay rate resulting in at least a five percent or eight percent increase after being slotted into the appropriate step. Thus, the surrounding circumstances in this case show that higher-assignment pay has always been identical to promotional pay increases in past contracts, and the disputed contract language continued this pattern. This view of the surrounding circumstances is consistent with the plain language of the contract; the majority's approach is not.

¶ 36. I am equally unpersuaded by the majority's reliance on "the uncontradicted accounts of the circumstances surrounding the making of the agreement from individuals who were on *both* sides of the bargaining table at the time the higher-assignment-pay language was amended to reference the rate on promotion provision." *Ante*, ¶ 19. The State's or VSEA's "understanding" of the contract terms, or their lack of discussion about "slotting," cannot be used to vary the plain language of the parties' agreement. Their beliefs do not render the contract ambiguous. Our goal in interpreting contracts is "to give effect to the intent of the parties as that intent is expressed in their writing," and "[w]hen the contract language is clear, the intent of the parties is taken to be

what the agreement declares." *Hamelin v. Simpson Paper (Vermont) Co.*, 167 Vt. 17, 19, 702 A.2d 86, 88 (1997). If the parties intended to impose a flat-rate increase for higher-assignment pay, they could and should have said so in the contract. Instead, they drafted language that plainly provides for "slotting up" in calculating higher-assignment pay.

¶ 37. Finally, I am unpersuaded by the Board's rationale that its interpretation is supported by the past practice of the employer to provide only a five percent increase without slotting in circumstances of higher assignment. Up until this decision, the Board had described the governing law as: "[A] mistaken interpretation by the State of a provision of the Contract cannot justify denying employees rights to which they are entitled under a correct interpretation of the contract. A contractual provision which is incorrectly interpreted for a period of time does not render the provision invalid." *Vermont State Emps. Ass'n*, 11 V.L.R.B. 300, 306 (1988); see also *Nottingham*, 25 V.L.R.B. 185, 192 (2002). The Board has ignored its own precedents in ruling to the contrary here.

¶ 38. "Our duty is to interpret disputed contract language, not remake it, or ignore it." *In re Graves*, 147 Vt. 519, 523, 520 A.2d 999, 1001 (1986) (quotation omitted). Because the contract language here is unambiguous, it should be enforced as written. Grievant is entitled to higher-assignment pay of at least five percent after being slotted into the appropriate step, and the majority errs in concluding otherwise.

¶ 39. I am authorized to state that Justice Crawford joins this dissent.