NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 98

No. 2014-087

| | |
|---|---|
| Equinox on the Battenkill Management Association, Inc. | Supreme Court |
| | |
| v. | On Appeal from<br>Superior Court, Bennington Unit,<br>Civil Division |
| | |
| Philadelphia Indemnity Insurance Company, Inc. | October Term, 2014 |

John P. Wesley, J.

Joel P. Iannuzzi of Cleary Shahi & Aicher, P.C., Rutland, for Plaintiff-Appellant.

Richard J. Windish and Susan J. Manley of Hayes & Windish, Woodstock, for
  Defendant-Appellee

PRESENT: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Morris, Supr. J. (Ret.),
        Specially Assigned

¶ 1. **REIBER, C.J.** Equinox on the Battenkill Management Association, Inc., appeals a superior court summary-judgment order denying insurance coverage. The appeal arises out of a declaratory judgment action against management association's insurer, Philadelphia Indemnity Insurance Company, Inc., to determine coverage under a commercial general liability policy for damage to cantilevered balconies on condominium units in Manchester.

¶ 2. In this appeal, we are asked to decide whether our decision in Gage v. Union Mutual Fire Insurance Co. remains good law with regards to the meaning of "collapse" and whether Gage controls the result here. 122 Vt. 246, 169 A.2d 29 (1961). We conclude that the

policy language in this dispute is broader than the language in <u>Gage</u> and that therefore <u>Gage</u> does not control. We reverse the trial court's summary judgment and remand to resolve disputed questions of fact and interpret the applicable policy language.

¶ 3.     Management association manages a condominium complex in Manchester. Many units in the condominium complex were constructed with cantilevered balconies. The balconies have a history of repairs. In 2012, management association sought coverage for damage to the balconies, which insurer denied. The 2012 insurance policy between management association and insurer provides that insurer "will not pay for 'loss' caused by or resulting from . . . [f]aulty, inadequate, or defective . . . [d]esign, specifications, workmanship, repair, construction, renovation, remodeling, grading, [or] compaction" (the "defective-workmanship exclusion"). However, the policy also provides that "if 'loss' by a Covered Cause of Loss results, [insurer] will pay for that resulting 'loss.' "  In the endorsement entitled "Additional Coverage - Collapse," the policy provides, "We will pay for 'loss' caused by or resulting from risks of direct physical 'loss' involving collapse of 'buildings' or any part of 'buildings' caused only by one or more of the following: . . . [h]idden decay." The policy defines "loss" as "accidental loss or damage," and "buildings" as "buildings or structures." The policy does not define "collapse," except to exclude "settling, cracking, shrinkage, bulging or expansion."

¶ 4.     In its statement of undisputed facts submitted in support of its motion for summary judgment, management association claimed that when it carried out a deck-replacement program in 2007 and 2008, it encountered certain structural problems at Unit I-4, including water damage to sheathing and studs behind lower-level exterior clapboards and cracking in several exposed joists beneath the second-floor balcony. Steps were taken to strengthen the second-floor balcony. Management association discovered similar problems at other units and took steps to reinforce the balconies at those units in 2008, 2010, and 2011.

According to the statement of undisputed facts, none of these repairs or improvements required exposing balcony joists within the interior of the units.

¶ 5.  Management association claims that it first discovered evidence of damage on the interior portions of the cantilevered balcony joists in September 2012, while inspecting the balcony at Unit K-3, which had undergone a "partial collapse."[1]  Prior to this inspection, none of the interior portions of any of the joists had been inspected or exposed.  Management association further claims that during this time, the balcony at Unit M-7 also suffered a "partial collapse."

¶ 6.  In October 2012, management association filed a first-party claim with insurer under the "Additional Coverage" endorsement, alleging that hidden decay had caused the damage.  Management association seeks coverage for the balconies that are affected by the same kind of damage that occurred at K-3 and M-7.[2]  The summary-judgment record reveals the efforts of the parties to engage expert support for their respective positions regarding complex questions of damage and causation.  These efforts focused on the K-3 and M-7 balconies.

¶ 7.  The association hired Criterium-Lalancette Engineers to conduct a visual inspection later that month.  Criterium-Lalancette noted significant evidence of moisture infiltration in its October 23 report.  The report recommended that the balconies be taken out of service.

¶ 8.  Management association claims that the M-7 balcony subsequently suffered a full collapse at some point in November 2012.  While securing the building against winter weather,

---

[1]  Insurer did not oppose management association's use of the phrase "partial collapse" to describe the damage to the balconies.  We note that "[t]he term 'partial collapse' . . . may be an epithet of convenience but it is not to be regarded as a term of construction."  Gage, 122 Vt. at 250, 169 A.2d at 31.  In this case, as in Gage, "[t]he policy says nothing about 'partial collapse.' "  Id.

[2]  When questioned at oral argument, counsel for management association responded that there are approximately ninety balconies at the condominium complex, of which between twelve and fifteen are in "various stages of collapse."  The location schedule in the insurance policy lists over fifty residential buildings with multiple units, but does not indicate which units have balconies.

management association removed supporting jack posts and disconnected railings connecting the balcony to the building, "resulting in the balcony falling to the deck below."

¶ 9.  Insurer hired Barbara Knight of Knight Consulting Engineers, Inc., to conduct an inspection at the condominium to determine the cause of the damage to the balconies.  Knight conducted an inspection on November 2.  Her report from November 12 noted that she did not observe any rot on exposed areas of the balcony joists, but did opine that construction and design issues contributed to the balcony failures.  Insurer denied coverage for the damage to the balconies in February 2013.

¶ 10.  Management association requested that insurer reconsider and provided additional evidence.  Knight reviewed the additional evidence, including photographs of where the balcony joists penetrated the building wall that revealed internal rot.  Based on the additional evidence, Knight issued a supplemental report in April 2013 that attributed the structural failure to rot and deterioration of the joists.

¶ 11.  In May 2013, insurer reaffirmed its no-coverage position.  In its second denial letter, insurer raised objections to management association's claim under the policy's endorsement for "Additional Coverage" for "collapse."  Insurer claimed that the cantilevered balconies did not actually collapse, and also that, even if the 2012 damage did fit within the definition of "collapse," the cause could not be for causes listed in the endorsement because management association allegedly had knowledge of defects in the balconies as early as 2007.

¶ 12.  Legal proceedings began in August 2013 when management association filed an action for declaratory judgment in the Superior Court, Civil Division, Bennington Unit. Management association sought an order declaring that the policy provides coverage for the balconies' failure.  In its answer, insurer denied coverage for the damage and asserted as defenses the exclusions and limitations in the policy, as well as the objections it raised in its claim-denial letters.  Management association filed a motion for summary judgment, arguing

4

that: (1) the damage to the balconies qualified under the policy's "collapse" coverage; (2) the defective-workmanship exclusion did not apply to its claim; and (3) the facts do not support insurer's claim that management association knew as early as 2007 that the balconies were structurally impaired.

¶ 13.  Insurer filed a cross-motion for summary judgment, arguing that the damage to the balconies was not covered under the additional coverage provision because non-enumerated causes contributed to the damage: defective construction, faulty design, poor choice of materials, and rot.  Moreover, insurer argued that the balconies did not collapse as that term was defined in Gage, 122 at 248-49, 169 A.2d at 30.  Insurer also responded to management association's argument that an exception to the defective-workmanship exclusion applies to the damage.

¶ 14.  Management association opposed the cross motion, arguing that the language of the policy is distinct from the language at issue in Gage.  Management association also argued that whether faulty workmanship contributed to the balcony failures was a disputed material fact that precludes granting summary judgment on the grounds that the defective-workmanship exclusion applied.  Management association filed a statement of disputed material facts in support of this argument—the statement refers to an affidavit from David Capen, a building contractor, which refutes Barbara Knight's opinion that the balconies were constructed improperly.  Furthermore, management association argued that even if insurer could prove defective construction was a contributing factor to the balconies' damage, the defective-workmanship exclusion would not apply because of the provision providing additional coverage for collapse.

¶ 15.  The superior court never reached these arguments and did not address the question of disputed facts.  The court denied management association's motion and granted insurer's cross-motion, concluding that insurer was entitled to judgment as a matter of law.  The court based its decision on the meaning of "collapse," concluding that the damage to the

balconies did not fit within the definition from Gage. The decision did not reach the parties' other arguments regarding the defective-workmanship exclusion or the cause of the damage. With regard to management association's contention that the language of its policy with insurer substantially differed from the policy in Gage, the court stated only that "[t]he exclusion of collapse for settling, cracking, shrinkage serves to limit the meaning of collapse, not to expand it." The court did not interpret any other policy language or the remaining language in the phrase "risks of direct physical loss involving collapse." This appeal followed.

¶ 16. In deciding whether summary judgment is proper, we apply the same standard as the superior court. Messier v. Metro. Life Ins. Co., 154 Vt. 406, 409, 578 A.2d 98, 99 (1990). If genuine issues of material fact exist, we reverse a grant of summary judgment. Id. "[I]nterpretation of an insurance policy, like other contracts, is a question of law. Our review is therefore nondeferential and plenary." Coop. Ins. Cos. v. Woodward, 2012 VT 22, ¶ 8, 191 Vt. 348, 45 A.3d 89 (citation omitted). In interpreting the language of an insurance policy, "we look at all the provisions . . . together and view the policy in its entirety." McAlister v. Vt. Prop. & Cas. Ins. Guar. Ass'n, 2006 VT 85, ¶ 17, 180 Vt. 203, 908 A.2d 455.

¶ 17. We agree with management association that the language of the policy in this case and the policy in Gage have different meanings. We therefore conclude that the superior court erred in granting summary judgment on the ground that "the balconies did not collapse." The court's error lies in interpreting the insurance policy in a way that equates its language with the meaning of "collapse" that we adopted in Gage and then basing its decision solely on that interpretation. The language in the Gage policy specifically covered "all direct loss to the property by . . . [c]ollapse." Gage, 122 Vt. at 246, 169 A.2d at 29. The language of the policy between management association and insurer provides that insurer will pay for " 'loss' caused by or resulting from risks of direct physical 'loss' involving collapse of 'buildings' or any part of 'buildings.' " (Emphasis added.)

6

¶ 18. The difference in language is great. The language in the policy between insurer and management association plainly contemplates damage beyond the definition of "collapse" that we adopted in Gage. Because it covered only "collapse," the insurance policy in Gage provided coverage only where there had been damage such as a "falling in, . . . loss of shape, . . . [or] reduction to flattened form or rubble of the building or any part thereof." Gage, 122 Vt. at 249, 169 A.2d at 30-31 (quoting Cent. Mut. Ins. Co. v. Royal, 113 So. 2d 680, 683 (Ala. 1959)).[3] Here, however, the policy contains additional language beyond "collapse." The balconies may incur damage from a "risk of direct physical 'loss' involving collapse" even where they have not detached and completely fallen away from the buildings. (Emphasis added). The court gave no consideration to the additional language, and so the question therefore remains whether the damage to the balconies falls within this policy's coverage.

¶ 19. We are not alone in finding that the language of the policy in this case—" 'loss' caused by or resulting from risks of direct physical 'loss' involving collapse"—has a broader meaning than the language in Gage. Confronted with policies containing similar or identical language to the policy at issue here, other states have concluded that such terms are at least ambiguous, leading to coverage conclusions in favor of those insured. Such language may even expressly expand the scope of coverage if a court finds that a catastrophic failure is imminent or

_____

[3] In deciding Gage, we cited Royal, a decision from the Supreme Court of Alabama, as being particularly illuminating. Gage, 122 Vt. at 246, 169 A.2d at 30. Royal concluded that no collapse had occurred where cracks had developed in a building's walls and foundation. 113 So. 2d at 683. A subsequent decision from the Court of Civil Appeals of Alabama determined that a "sufficient and actual collapse . . . [that] destroy[ed] the structural integrity of the building" occurred where termite damaged caused a house's floor to sag about eight inches but did not "reduce the house to flattened form or rubble." Fid. Cas. Co. of N.Y. v. Mitchell, 503 So. 2d 870, 871 (Ala. Civ. App. 1987). The insured in Mitchell presented evidence that the building was so severely damaged that it could not be safely inhabited. Id.; see also State Farm Fire & Cas. Co. v. Slade, 747 So. 2d 293, 325-26 (Ala. 1999) (discussing Royal and Mitchell and finding no "collapse" coverage where insured failed to present "evidence indicating that any part of their home had actually fallen in, i.e., collapsed, or that the structural integrity of their home was so damaged that their home was unfit for human habitation").

that the insured building's structural integrity has degraded to the point where it cannot be safely and reliably used.

¶ 20.   The Supreme Court of South Carolina has interpreted the language at issue to have a broader meaning than a policy that covers only "collapse." Ocean Winds Council of Co-Owners, Inc. v. Auto-Owner Ins. Co., 565 S.E.2d 306, 307-08 (S.C. 2002).  In determining the question of when coverage is triggered under a policy that covered "risks of direct physical loss involving collapse," the court held that the "phrase is more expansive than the word 'collapse' and appears to cover even the threat of loss from collapse." Id.  The court determined that "a requirement of imminent collapse is the most reasonable construction of the policy clause covering 'risks of direct physical loss involving collapse.' " Id. at 308.

¶ 21.   The Supreme Court of Pennsylvania has also considered a policy that provided coverage for "damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building." 401 Fourth St., Inc. v. Investors Ins. Grp., 879 A.2d 166, 168 (Pa. 2005).  The court did not limit itself merely to the meaning of "collapse," but rather focused on the phrase, "risks of direct physical loss involving collapse." Id. at 172.  The court concluded that the term is ambiguous in that "the provision contemplates broader coverage than policy language simply employing the term 'collapse.' " Id. at 174.  Construing the term in favor of the insured, the Pennsylvania high court held that a policy providing coverage for risks of direct physical loss involving collapse covers "damage caused by the falling down, or imminent falling down of a building or part thereof." Id.

¶ 22.   More recently, the Supreme Court of South Dakota took up the question in a case involving an insurance policy with identical language. Zoo Props., LLP v. Midwest Family Mut. Ins. Co., 2011 S.D. 11, ¶¶ 3-4, 797 N.W.2d 779.  That court agreed with the Supreme Court of South Carolina in deciding that a term extending coverage to "loss or damage caused by or resulting from risks of direct physical loss involving collapse" was ambiguous. Id. ¶ 11 (citing

8

Ocean Winds, 565 S.E.2d at 308). The South Dakota high court construed the phrase to be broader than the language used in the Gage policy, which required the court to interpret only a single word, "collapse." Id. ¶¶ 11-12. Like the high courts of South Carolina and Pennsylvania, the Supreme Court of South Dakota also interpreted the language at issue to include imminent collapse. Id. ¶ 12.

¶ 23. While these three jurisdictions include "imminent collapse" within the meaning of "risks of direct physical loss involving collapse," other jurisdictions have taken different approaches when interpreting policies with the same language. Indeed, the Supreme Court of South Carolina observed that other states' constructions fall across a wide spectrum. Ocean Winds, 565 S.E.2d at 308. At one end of the spectrum is the most stringent interpretation, which still requires "actual collapse." See Heintz v. U.S. Fid. & Guar. Co., 730 S.W.2d 268, 269 (Mo. Ct. App. 1987) (interpreting policy containing "risk of direct physical loss involving collapse" language and concluding that "[a] condition of impending collapse is insufficient"). At the other end is the most lenient interpretation, which covers mere "substantial impairment" of the building. See Am. Concept Ins. Co. v. Jones, 935 F. Supp. 1220, 1228 (D. Utah 1996) (construing same language to require that insured show only issue of material fact that covered building "sustained substantial impairment to its structural integrity" to successfully oppose motion for summary judgment). In between either extreme are states that have construed the phrase to require "imminent collapse."

¶ 24. We reject the most stringent interpretation requiring actual collapse. The single word "collapse" and the phrase "risk of loss involving collapse" cannot mean the same thing. We also reject as overly broad an interpretation that requires only "substantial impairment." In choosing the middle ground, we conclude that "a risk of direct physical loss involving collapse" means a risk of imminent collapse.

¶ 25. Having reached this conclusion, we are not in a position to determine whether there is coverage for the damaged balconies. The superior court's decision is insufficient for us to construe or deny coverage as a matter of law given the disputed cause, nature, and extent of the damage. There are obvious factual disputes between the parties. On remand, the court must resolve questions of fact about the damage claimed. Summary judgment is therefore inappropriate.

¶ 26. In addition to the question of whether a policy covering "risk of direct physical 'loss' involving collapse" covers the damage to the balconies in this dispute, our conclusion also reopens questions of construction that the superior court never reached. Even applying the "risk of imminent collapse" standard to the facts, the court may determine that the policy language is ambiguous as a matter of law and construe the ambiguity favorably for management association. Cf. Fireman's Fund Ins. Co. v. CNA Ins. Co., 2004 VT 93, ¶ 9, 177 Vt. 215, 862 A.2d 251 ("Any ambiguity will be resolved in the insured's favor, but we will not deprive the insurer of unambiguous terms placed in the contract for its benefit."). The court can make this determination only once it has resolved the factual issues. The court may also need to determine whether the defective-workmanship exclusion operates to deny coverage. On remand, the court must therefore resolve questions of fact about the damage before deciding whether the policy provides or excludes coverage. These issues are for the court to determine in the first instance.

¶ 27. In short, by basing its decision solely on its conclusion that the damage was not caused by "collapse," as we interpreted the word in Gage, the disputed facts apparent from the summary-judgment filings alone make clear that a number of unresolved legal and factual issues remain, including: (1) whether the damage to the balconies constitutes losses caused by or resulting from risks of direct physical loss involving collapse; (2) whether this policy language when applied is ambiguous as a matter of law; (3) what caused the damage; and (4) whether the defective-workmanship exclusion applies to the claim. Although our own interpretation of

insurance policy language is plenary and non-deferential, we decline to address these questions in the absence of the superior court's initial construction of the policy provisions in the context of its findings regarding all relevant facts.

<u>Reversed and remanded for further proceedings consistent with this opinion</u>.

FOR THE COURT:

_____
Chief Justice

¶ 28.    **ROBINSON, J., concurring in the judgment.**    I concur in the result, but write separately to emphasize the ways in which I part ways with the majority's approach.

¶ 29.    First and foremost, I simply don't understand the majority's instructions to the trial court with respect to the scope of the "collapse" coverage.  The majority concludes that the proper construction of the language in question, providing for coverage for " 'loss' caused by or resulting from risks of direct physical 'loss' involving collapse of 'buildings' or any part of 'buildings,' " is not governed by <u>Gage</u>.  Instead, the majority holds—and I agree—that the policy language in this case extends coverage to circumstances in which there is a risk of imminent collapse.    <u>Ante</u>, ¶ 24. Given the conflicting evidence in the summary-judgment record concerning the nature and extent of the risk of imminent collapse, the majority concludes that summary judgment on the applicability of the collapse coverage for either party is inappropriate. So far, so good.

¶ 30.    But then the majority says something puzzling:

> Even applying the "risk of imminent collapse" standard to the facts, the court may determine that the policy language is ambiguous as a matter of law and construe the ambiguity favorably for management association.    The court can make this determination only once it has resolved the factual issues.

<u>Ante</u>, ¶ 26 (citation omitted).

11

¶ 31. This statement is hard to understand for several reasons. For one, in the preceding paragraphs the majority construes the contract and lays down the standard by which the "collapse" coverage is to be evaluated. Ante, ¶¶ 17-24. By then suggesting that in fact the contract may be ambiguous and thus have some different meaning, this statement seems to walk back the conclusion that the majority has just articulated. It's hard to see what guidance, if any, this provides the trial court.

¶ 32. Moreover, the question of whether a contract is ambiguous is a question of law. See In re Spear, 2014 VT 57, ¶ 15, ___ Vt. ___, 99 A.3d 618 ("The threshold question of whether contract language is ambiguous is a question of law.") (citing Isbrandtsen v. N. Branch Corp., 150 Vt. 575, 577, 556 A.2d 81, 83 (1988)). See also Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 1998) ("Whether contract language is ambiguous is a question of law, which we review de novo"); Baybank v. Vt. Nat'l Bank, 118 F.3d 30, 33 (1st Cir. 1997) ("In Vermont, whether a contract is ambiguous is a question of law."); 1 B. O'Donnell, Law and Practice of Insurance Coverage Litigation § 1.2 (2000) ("The interpretation of an insurance policy and the identification of ambiguous policy provisions typically present questions of law subject to de novo review."); 11 R. Lord, Williston on Contracts § 30:5, at 64 (4th ed. 1999) [hereinafter Williston] ("The determination of whether a contract is ambiguous is a question of law for the court"); 5 M. Niffin, Corbin on Contracts § 24.30, at 330 (rev. ed. 1998) ("The decision as to whether a contract is ambiguous is made by the court"); 2 S. Plitt et al., Couch on Insurance § 21:13 (3d ed. 1995) ("Whether or not a contract of insurance is ambiguous is a question of law for the court."); R. Warner, All Mixed Up About Contract: When Is Contract Interpretation a Legal Question and When Is It a Fact Question?, 5 Va. L. & Bus. Rev. 81, 92 (2010) ("[T]he interpretation of insurance policies is almost always a legal issue"). If this

contract is ambiguous, now is the time for us to say so, and to invite the court on remand to consider evidence surrounding the execution of the contract to resolve any ambiguity.

¶ 33. Moreover, the question of whether the contract is ambiguous is answered with reference to the contract itself, or, at most, the contract and a narrow class of extrinsic evidence relating to the formation of the contract. See Spear, 2014 VT 57, ¶ 15 ("When addressing the threshold question of whether ambiguity exists, a court may consider limited extrinsic evidence, including the circumstances surrounding the making of the agreement as well as the object, nature and subject matter of the writing." (emphasis added) (quotation omitted)); Cameron's Run, LLP v. Frohock, 2010 VT 60, ¶ 20, 188 Vt. 610, 9 A.3d 664 (mem.) ("The court may consider limited extrinsic evidence of circumstances surrounding the making of the agreement in determining whether the writing is ambiguous, which is a question of law subject to de novo review." (quotation omitted)); Breslauer v. Fayston Sch. Dist., 163 Vt. 416, 425, 659 A.2d 1129, 1135 (1995) (noting that in making legal determination as to whether contract is ambiguous, court may consider "evidence as to the circumstances surrounding the making of the agreement as well as the object, nature and subject matter of the writing" (quoting Isbrandtsen, 150 Vt. at 578, 556 A.2d at 84)); see also Williston § 30:5, at 67-68 ("While there is authority that the court is limited in its consideration solely to the face of the written agreement, it is also held that a court may provisionally receive . . . all credible evidence concerning the parties' intentions to determine whether the language of the contract is reasonably susceptible to the interpretation urged by the party claiming ambiguity." (footnotes omitted)). No evidence about the balconies and joists can or should advance the analysis of whether this contract is ambiguous and how it should be construed. The majority's suggestion to the contrary upends black-letter law concerning the construction of contracts, and sends mixed signals to the trial court on remand.

¶ 34. Second, I would not remand with respect to the host of other legal issues squarely presented on appeal. The majority leaves it to the trial court to address in the first instance the

13

purely legal questions that are subject to de novo review on appeal. One issue squarely raised by the motions below and briefed on appeal is whether, assuming plaintiff can show a collapse, a factfinder could conclude on this summary-judgment record that the collapse resulted from one of the covered <u>causes</u> of collapse—in particular, from "hidden decay." If a factfinder could conclude that the loss resulted from hidden decay, Philadelphia's summary-judgment motion would be defeated. If a factfinder could conclude that the loss did <u>not</u> result from hidden decay, Equinox's summary-judgment motion would be defeated.

¶ 35. The resolution of this question is a matter of law. See <u>Rouleau v. Williamstown Sch. Bd.</u>, 2005 VT 131, ¶ 2, 179 Vt. 576, 892 A.2d 223 (mem.); <u>Washington v. Pierce</u>, 2005 VT 125, ¶ 17, 179 Vt. 318, 895 A.2d 173. By definition, a summary-judgment question does not require a weighing of evidence or judgments about credibility. See <u>Sabia v. Neville</u>, 165 Vt. 515, 523, 687 A.2d 469, 474 (1996) ("In ruling on a motion for summary judgment, it is not appropriate for us to resolve disputed issues of fact or questions of credibility."). And the trial court's judgment on this question is subject to de novo review. <u>Rouleau</u>, 2005 VT 131, ¶ 2; <u>Washington</u>, 2005 VT 125, ¶ 17; <u>Wesco</u>, 2004 VT 102, ¶ 9.

¶ 36. If, by remanding, the majority is implicitly concluding that there is sufficient evidence on both sides of the "hidden decay" question to defeat summary judgment, I do not disagree. But the majority neither says this nor undertakes any sort of analysis of the summary-judgment record to support such a conclusion. Instead, the majority defers to the trial court to make its own legal ruling on the summary-judgment motion in the first instance, even though its analysis will be subject to de novo review. See <u>N.H. Right to Life PAC v. Gardner</u>, 99 F.3d 8, 18 (1st Cir. 1996) ("Where the merits comprise a purely legal issue, reviewable de novo on appeal and susceptible of determination without additional factfinding, a remand ordinarily will serve no useful purpose.").

¶ 37.    Similarly, the questions of whether the general policy exclusion of coverage for losses resulting from defective design or construction applies to the collapse coverage provisions appended to the contract as "Additional Coverage," and whether, if so, the "resulting loss" exception to the exclusion applies, are all legal questions that were raised below, have been briefed on appeal, and are potentially dispositive of this case.  I believe we should have reached them.

¶ 38.    The majority's approach may reflect an appropriate recognition of the wisdom of the trial court, and a desire to consider that court's legal analysis of issues that it did not reach the first time around.  But I fear that it leaves the parties and trial court with no guidance, leaves the trial court with a considerable amount of work, and potentially prolongs an already lengthy course of litigation for all concerned.

_____
Associate Justice