NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 50

No. 2018-372

| | |
|---|---|
| In re Vermont State Colleges Faculty Federation, AFT Local 3180 | Supreme Court |
| | On Appeal from Labor Relations Board |
| | May Term, 2019 |

Richard W. Park, Chair

Patrick N. Bryant of Pyle Rome Ehrenberg PC, Boston, Massachusetts, for Petitioner-Appellant.

Todd W. Daloz, Associate General Counsel, Vermont State Colleges, Montpelier, for Respondent-Appellee.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **EATON, J.** The Vermont Labor Relations Board (Board) dismissed a petition for election of a collective-bargaining representative filed by appellant-petitioner, Vermont State Colleges Faculty Federation (Federation). The petition sought to include part-time faculty teaching for the Vermont State Colleges (VSC) distance-learning program (DLP) in the existing part-time faculty collective bargaining unit represented by the Federation. The Federation filed an initial and amended petition, in response to which the Board issued three orders—an original and two amended orders.[1] In its second amended order, which is the order on appeal, the Board

---

[1] The substance of the Federation's initial and amended petitions and the Board's initial and amended orders will be discussed in detail below.

dismissed the petition for failing to propose an appropriate bargaining unit. On appeal, the Federation asks this Court to reverse the Board's dismissal and order the Board to reinstate the petition and conduct an election among the proposed unit members. VSC argues that this Court should affirm the Board's original decision and order an election or, in the alternative, affirm the Board's second amended order dismissing the petition. We affirm the Board's dismissal.

¶ 2. We begin with a brief overview of the Board's statutory authority to determine collective-bargaining unit configurations and a summary of the facts and procedural history relevant to this appeal. The Vermont Legislature enacted the State Employees Labor Relations Act (SELRA), 3 V.S.A. §§ 901-1008, in 1969 to outline the rights of "both State employees and the State of Vermont and of Vermont State Colleges and the University of Vermont in their relations with each other" and "to protect the rights of individual employees in their relations with labor organizations" and "to protect the rights of the public in connection with labor disputes." Id. § 901; see also 1969, No. 113, § 1. The SELRA, in relevant part, authorizes the Board to determine appropriate collective bargaining units to represent the interests of employees. Id. §§ 921-929, 941. Three sections of the SELRA pertain to our analysis of the Board's collective-bargaining-unit determination in this case—3 V.S.A. §§ 902, 927, and 941.

¶ 3. Section 902 defines "collective bargaining" as "the process of negotiating terms, tenure, or conditions of employment," id. § 902(2), and "collective bargaining unit" as "the employees of an employer, being either all of the employees, the members of a department or agency, or other such unit or units as the board may determine are most appropriate to best represent the interest of employees." Id. § 902(3) (emphasis added.)

¶ 4. Building on those definitions, § 927 confers statutory authority on the Board to determine which unit configurations are appropriate and to decline to recognize a proposed bargaining unit that it deems inappropriate or that would result in over-fragmentation. The language of § 927 is as follows:

2

(a)  The Board shall decide the unit appropriate for the purpose of collective bargaining in each case and those employees to be included therein, in order to assure the employees the fullest freedom in exercising the rights guaranteed by this chapter.

(b)  In determining whether a unit is appropriate under subsection (a) of this section, the extent to which the employees have organized is not controlling.

(c)  The Board may decline recognition to any group of employees as a collective bargaining unit if, upon investigation and hearing, it is satisfied that the employees will not constitute an appropriate unit for purposes of collective bargaining or if recognition will result in over-fragmentation of state employee collective bargaining units.

(Emphases added.)

¶ 5.    Section 941 enables employees or an employee organization, such as the Federation in this case, to file a petition with the Board "alleging . . . that they wish to form a bargaining unit and be represented for collective bargaining."  Id. § 941(c).  Upon receipt of a petition under § 941(c), the Board must then investigate the petition and, "if it finds reasonable cause to believe that a question of unit determination or representation exists," schedule a hearing before the Board.  Id. § 941(d).

¶ 6.    Section 941(a) reiterates that "[t]he Board shall determine issues of unit determination, certification, and representation in accordance with [the SELRA]."  Section 941(f) outlines the criteria that the Board must consider when determining the appropriateness of a collective-bargaining unit, although the Board may also look to other factors in deciding the appropriateness of a unit.  Section 941(f) states:

In determining the appropriateness of a collective bargaining unit the Board shall take into consideration but not be limited to the following criteria:

(1)  The authority of governmental officials at the unit level to take positive action on matters subject to negotiation.

(2)  The similarity or divergence of the interests, needs, and general conditions of employment of the employees to be represented.  The Board may, in its discretion, require that a separate vote be taken among any particular class or type of employees

3

within a proposed unit to determine specifically if the class or type wishes to be included.

(3) Whether over-fragmentation of units among State employees will result from certification to a degree which is likely to produce an adverse effect on effective representation of State employees generally, or upon the efficient operation of State government.

(Emphases added.)

¶ 7.     If the Board finds substantial interest among employees in forming a bargaining unit, then the Board must conduct a vote by secret ballot to determine the wishes of the employees in the voting group involved regarding the formation of the unit.  There must be a majority vote cast in favor of forming the unit for it to be certified and recognized by the Board.  Id. § 941(e).

¶ 8.     In the "absence of substantive evidence" that an appropriate bargaining unit exists, the Board shall dismiss the petition.  Id. § 941(d); see also Vermont Labor Relations Board Rules of Practice § 13.6, https://vlrb.vermont.gov/sites/vlrb/files/documents/Rules%20of%20 Practice/Part%201/part1.htm   [https://perma.cc/A27B-4D2B]  (regarding determination of showing-of-interest requirement to support petition for election of collective-bargaining representative, "[i]f sufficient showing of interest is not made . . . the Board will dismiss the petition").

¶ 9.     In sum, the Board has broad statutory authority to refuse to recognize a petitioned-for unit that it deems inappropriate or that would result in over-fragmentation of the collective bargaining units, resulting in the petition's dismissal.

¶ 10.     With this statutory framework in mind, we examine the procedural history in more detail.  The Federation filed a petition for election of a collective-bargaining representative with the Board in December 2017, seeking to add part-time faculty employed in the DLP at Johnson State College (JSC) to the existing bargaining unit of part-time faculty at the campus-based

4

colleges in the VSC system.[2]  The existing bargaining unit is primarily comprised of part-time faculty who teach traditional, campus-based courses.  VSC contended that the proposed inclusion of DLP faculty, some of whom also teach on-campus programs, in the existing part-time faculty bargaining unit was inappropriate because the two groups do not share a sufficient community of interests.  VSC requested that the Board instead approve a separate, standalone unit for the part-time DLP faculty. The Board conducted a hearing regarding the proposed unit determination in March 2018.  Following the hearing, the Board issued an initial order in May 2018.

¶ 11.    In its May 2018 order, the Board listed its factual findings and, pursuant to its authority under § 927(c), declined to recognize the Federation's petitioned-for unit because it determined that including part-time DLP faculty within the existing part-time faculty unit would create an inappropriate bargaining unit.  In reaching this conclusion, the Board relied on the following factual findings.[3]

¶ 12.    At the time of the hearing, six represented collective bargaining units existed in the VSC, including a unit for "part-time faculty of the campus-based colleges represented by the Federation."  The JSC provost administers the part-time faculty bargaining unit agreement for JSC and Lyndon State College.  JSC maintains a DLP comprised of an External Degree Program (EDP) and the JSC program online (JSC online).  The Board made findings of fact regarding the purpose, student composition, administration, and hiring practices of the EDP, which was established in

---

[2]    VSC, the employer, filed a response to the petition raising questions of unit determination, and the Federation amended its petition in February 2018.  The amended petition—which is the basis for this appeal—similarly requested the addition of part-time DLP faculty employed by VSC and teaching at JSC to the existing part-time faculty bargaining unit.  Any differences between the Federation's initial and amended petitions are not relevant to our analysis.

[3]    As explained below, the Board's October 2018 amended order is the decision under review on appeal.  Accordingly, the facts referenced in this decision are drawn from the Board's October 2018 amended order.  The Board's factual findings included in its October 2018 amended order are identical to the factual findings in its August 2018 amended order and nearly identical to the factual findings in its initial May 2018 order.  The changes in the Board's factual findings between its initial and amended orders, which were not substantial, do not affect our analysis.

1978, and the more recent JSC online, which launched in 2016. Both programs incorporate distance-learning courses and serve distance-learning students. EDP courses are available to campus-based students, while JSC online solely serves distance-learning students.

¶ 13. Additionally, the Board made multiple findings regarding the differences in lifestyle, background, and opportunities available to distance-learning and on-campus students, as well as the different classroom environments, geographic locations, professional requirements, and hiring practices experienced by distance-learning faculty in contrast to faculty for traditional on-campus courses. Based on these factual findings, the Board found that "[t]he experience for distance learning students differs significantly from the experience for students for traditional on-campus courses," and "[t]he experience for faculty teaching in Distance Learning differs significantly from that experienced by faculty for traditional on-campus courses." The Board also emphasized that "[o]nline is a growing means to deliver higher education instruction." After reviewing these facts, the Board concluded that part-time DLP faculty did not share a sufficient community of interests with part-time faculty in the existing bargaining unit to constitute an appropriate unit under § 927 and the § 941(f) criteria.

¶ 14. After declining to recognize the petitioned-for unit, the Board determined that a new bargaining unit for part-time DLP faculty, separate from the existing part-time faculty unit, would constitute an appropriate unit based on the DLP faculty's shared community of interests and the advent of online-education models. The Board ordered that an election be held for members of this Board-proposed bargaining unit (a standalone unit for all part-time DLP faculty) instead of adding those employees to the pre-existing part-time faculty unit as requested by the Federation's petition. The Federation filed a motion for reconsideration, arguing that the Board erred in concluding the petitioned-for unit was inappropriate and that the Board's proposed unit would result in over-fragmentation.

¶ 15. The Board granted the Federation's motion to reconsider over VSC's objection and issued an amended order in August 2018—its second order responding to the amended petition. In its August 2018 amended order, the Board reaffirmed that the Federation's petitioned-for unit was inappropriate. It also revised its Board-proposed unit determination from the May 2018 order, eliminating the unit it designated in the first order and creating another, different proposed unit. In doing so, the Board split the part-time DLP faculty into two subgroups—(1) part-time DLP faculty who taught both online and on-campus courses, and (2) part-time DLP faculty who taught only online courses. The Board's August 2018 order subsumed the first subgroup (part-time DLP faculty who taught both online and on-campus courses) into the pre-existing part-time faculty bargaining unit, as requested by the Federation. It then created a new, standalone bargaining unit for the second subgroup (part-time DLP faculty who only taught online courses), which was not anticipated in the petition. In conclusion, the Board denied the Federation's petitioned-for unit and ordered an election be held among the relevant employees regarding the Board's proposed unit configurations. The Federation filed an interlocutory appeal and a motion to stay the election ordered by the Board, pursuant to Vermont Rule of Appellate Procedure 5(b), which the VSC opposed.

¶ 16. In response to the parties' filings, the Board issued a second amended order in October 2018—its third and final order in this case. In the October 2018 order, the Board dismissed the Federation's petition because—as the Board had concluded in all three of its orders—the petitioned-for unit was inappropriate. Specifically, the Board dismissed the petition because part-time DLP faculty who teach exclusively online do not share a sufficient community of interests with faculty in the existing unit to create an appropriate unit. The Board did not designate any unit configuration in the October 2018 order, effectively voiding its formerly designated units and election orders from May and August. However, the Board opined in dicta that the August 2018 unit configuration (splitting the DLP faculty into two units) was appropriate

7

and did not result in over-fragmentation, as argued by the parties. The Board suggested that, although the Board had dismissed the petition, this Court could decide whether over-fragmentation would occur if the Board approved such a unit configuration in the future, effectively seeking an advisory opinion.

¶ 17. The Federation appealed the Board's October 2018 amended order to this Court. The Federation raises four main arguments on appeal: (1) the Board erred by applying the wrong legal standard when evaluating the underlying petition; (2) the Board erred in determining that the existing part-time faculty bargaining unit is not an appropriate unit for part-time DLP faculty; (3) the Board erred in holding that the appropriate unit for part-time DLP faculty depends on whether they also teach campus-based courses, placing them in either a standalone unit for DLP faculty who teach exclusively online or the existing part-time faculty unit; and (4) the Board erred in basing its decision, in part, on various erroneous factual findings and by ignoring various undisputed facts.

¶ 18. VSC provides several arguments in opposition to the Federation's contentions but agrees with the Federation that the Board's proposed unit in its August and October 2018 amended orders results in over-fragmentation. Relevant to our analysis, VSC argues that—in each of its three orders—the Board correctly dismissed the Federation's underlying petition because the Federation's petitioned-for unit lacks a community of interest.

¶ 19. We conclude that the Board applied the correct legal standard in assessing the Federation's petition and that it did not err in determining that the petitioned-for bargaining unit is an inappropriate unit. Regarding the Federation's argument that the Board erred in basing its decision on erroneous factual findings and ignoring undisputed facts, we find no error.

¶ 20. Notably, we affirm only the portion of the Board's order dismissing the petition on the basis that the petitioned-for unit was inappropriate. The Board's final order also concludes, in dicta, that its proposed unit configuration from the August 2018 amended order was appropriate

8

and does not result in over-fragmentation. Because this conclusion is not a necessary part of the case's disposition, we do not address the parties' arguments regarding whether the Board's unit configuration proposed in the August and October 2018 amended orders runs afoul of the SELRA and Board precedent. See Wood v. Wood, 135 Vt. 119, 121, 370 A.2d 191, 192 (1977) (holding it is only appropriate for this Court to resolve questions necessary for disposition of matter).

¶ 21.    Our review of the Board's order on appeal "is highly deferential and is limited to evaluating whether the evidence supports the Board's factual findings, and whether those findings, taken as a whole, justify the conclusions of law." In re New Eng. Police Benevolent Ass'n, 2015 VT 51, ¶ 6, 199 Vt. 96, 121 A.3d 669 (quotation omitted). We accord substantial deference to decisions within the Board's expertise, such as the matter at hand. Vt. State Emps.' Ass'n v. State, 151 Vt. 492, 493, 562 A.2d 1054, 1055 (1989). The question of unit determination is squarely within the Board's area of expertise; as such, the Board's decisions "are presumed to be correct, valid, and reasonable, with a clear and convincing showing required to overcome the presumption." Petition of the VSEA, Inc., 143 Vt. 636, 642, 471 A.2d 230, 234 (1983) (quotation omitted). This Court "should only ask whether the findings of fact taken as a whole justify the Board's ultimate conclusion." Chauffeurs, Teamsters, Warehousemen, Helpers Union Local 597 v. Univ. of Vt., 167 Vt. 564, 565, 702 A.2d 75, 76 (1997) (mem.) (quotation omitted). If there is factual support for the Board's conclusion, then this Court "will leave it undisturbed." Vt. State Colls. Faculty Fed'n v. Vt. State Colls., 152 Vt. 343, 348, 566 A.2d 955, 958 (1983).

¶ 22.    The Federation first argues that the Board erred in failing to apply the correct legal standard when assessing the Federation's petition. To support its argument, the Federation points to 3 V.S.A. § 927(c), which permits the Board to decline recognition to a petitioned-for unit that is not an appropriate unit or will result in over-fragmentation. The Federation contends that, despite the language of § 927(c) and Board precedent prioritizing employee freedom in selecting collective-bargaining units, the Board declined to recognize the petitioned-for unit because it

9

believed separating part-time DLP faculty who exclusively teach online into a standalone unit would create a <u>more</u> appropriate unit. According to the Federation, the test the Board must apply is merely whether a petitioned-for unit is <u>an</u> appropriate unit, not the <u>most</u> appropriate unit, and the Board failed to apply that test here.

¶ 23. We agree with the Federation regarding the standard the Board applies when reviewing petitions for unit authorization but conclude that the Board did not err in applying that standard here.

¶ 24. The plain language of § 927(c) states that "[t]he Board <u>may decline recognition</u> to any group of employees as a collective bargaining unit if, upon investigation and hearing, it is satisfied that the employees will not constitute <u>an appropriate unit</u> for purposes of collective bargaining or if recognition will result in over-fragmentation of state employee collective bargaining units." 3 V.S.A. § 927(c) (emphasis added). Based on this language, the Board must as a preliminary matter determine whether the petitioned-for unit is an appropriate unit. The statute does not require that the petitioned-for unit be the most appropriate unit.

¶ 25. The Board correctly applied this standard here. Upon investigation and a hearing, the Board determined, based upon thorough findings of fact as discussed below, that the petitioned-for unit was not appropriate because the DLP faculty at issue did not share an adequate community of interests with the existing part-time faculty bargaining unit. As such, the Board was within its statutory authority to decline to recognize the proposed unit under § 927(c) and the Federation's claims of error are unfounded.

¶ 26. Contrary to the Federation's assertions, the fact that the Board (in its initial May 2018 and amended August 2018 orders) authorized the formation of units it deemed appropriate that differed from the one proposed by the Federation does not undermine the Board's application of the § 927(c) standard. As we recognized in In re VSEA, Inc., 143 Vt. at 641, 471 A.2d at 233:

> If, after hearing, the Board determines the unit as proposed is inappropriate, it may order the formation of a unit that is an appropriate one under the criteria set forth in 3 V.S.A. § 941(f). It may do this even though the unit deemed appropriate may not correspond precisely to the unit configuration proposed in the petition.

In that case, we found no error when the Board considered a petition and issued an order authorizing a unit different from the one proposed. Id.

¶ 27.    Such is the case here. The Board first determined that the petitioned-for unit was inappropriate and declined recognition under § 927(c); having rejected the proposed unit as inappropriate, it then determined an appropriate unit and ordered its formation. The Board was not comparing the two potential unit configurations to determine which was more appropriate—rather, it rejected the petitioned-for unit and then exercised its broad discretion under the SELRA to authorize an appropriate unit. See 3 V.S.A. § 902(3) (defining collective bargaining unit to include all employees of employer or other units "as the Board may determine are most appropriate"); id. § 927(a) ("The Board shall decide the unit appropriate for the purpose of collective bargaining in each case and those employees to be included therein . . . ."). We find no error.

¶ 28.    Next, the Federation argues that the Board erred in determining that the petitioned-for unit, which would combine part-time DLP faculty into the existing part-time faculty bargaining unit, was inappropriate.

¶ 29.    As explained above, the SELRA delegates broad authority to the Board to determine appropriate collective bargaining units, and we defer to the Board's expertise in this area. Vt. State Emps.' Ass'n,151 Vt. at 493, 562 A.2d at 1055. We will only overturn the Board's determination that a unit is inappropriate when the Board's conclusion is clearly erroneous; if there is factual support for the Board's conclusion, then this court "will leave it undisturbed." Vt. State Colls. Faculty Fed'n, 152 Vt. at 348, 566 A.2d at 958.

11

¶ 30. When determining whether a proposed unit is appropriate, the Board considers whether the proposed unit members share a "community of interests." Vt. State Emps.' Ass'n (Re: Sworn Law Enf't Officers), 32 V.L.R.B. 1, 15 (Jan. 20, 2012), https://vlrb.vermont.gov/ decisions/download; see also 3 V.S.A. § 902(3) (defining collective bargaining unit to include "unit or units as the Board may determine are most appropriate to best represent the interest of employees" (emphasis added)); id. § 941(f)(2) (mandating that, in determining appropriateness of proposed unit, Board must consider "similarity or divergence of the interests, needs, and general conditions of employment of the employees to be represented" (emphasis added)).

¶ 31. The definition of a community of interests "is not susceptible to precise definition or mechanical application." Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO v. Town of Middlebury, 6 V.L.R.B. 227, 232 (Sept. 15, 1983), https://vlrb.vermont.gov/decisions/download. However, the Board consistently looks to the following factors to determine whether such a community of interests exists: "differences and similarities in method of compensation, hours of work, employment benefits, supervision, qualifications, training, job functions, and job sites." Vt. State Emps.' Ass'n, 32 V.L.R.B. at 15; see also Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO, 6 V.L.R.B. at 232 (explaining that Board applies factors listed above, derived from National Labor Relations Board, when considering whether community of interest exists). It will also consider "whether employees have frequent contact with each other and have an integration of work functions." Vt. State Emps.' Ass'n, 32 V.L.R.B. at 15. A group of employees must be "a readily identifiable and homogenous group apart from other employees to support a determination that a community of interests exists among them." Id.

¶ 32. The Board applied these factors here and—in all three of its orders—determined that the petitioned-for unit was inappropriate because the proposed unit members (part-time DLP faculty and part-time faculty for traditional on-campus courses) did not share a sufficient community of interests. The Board specifically determined that DLP faculty who solely teach

online courses do not share a community of interests with the existing members of the part-time faculty bargaining unit.

¶ 33.   The Board based this determination on the following factual findings.  First, the Board found that "the students served by [DLP faculty who teach exclusively online] are substantially different than those taught by part-time faculty bargaining unit members" because the DLP students: participated in online courses from various "spread out" locations; were substantially part-time (seventy percent part-time students);  were generally older and employed; and, in the case of EDP students, must have already completed "approximately half of a baccalaureate program before admittance and participation."  In contrast, the Board found that the existing members of the part-time faculty unit primarily taught classes to traditional campus-based students, of whom the "vast majority" (ninety-one percent) are full-time students who are "in the classroom and just beginning their higher education experience."  Due to the different work locations, the Board also found that there was "no evident interaction" between exclusively online DLP and campus-based faculty. Based on these facts, the Board concluded that exclusively online DLP faculty and part-time faculty in the existing unit had "fundamentally different job sites and job demands" and a "set of learners with very different experiences and needs."

¶ 34.   Second, the Board concluded that the courses taught by DLP faculty who teach online courses exclusively are designed and presented in a "substantially different manner" than campus-based courses taught by the members of the part-time faculty bargaining unit because these DLP faculty must use an online platform called Moodle and because online interactions are "substantially different" than face-to-face interactions.  The Board's findings that DLP faculty "are required to obtain the technical skills necessary" to design and implement online courses and are specifically offered a tech training course, while on-campus faculty are not, further evidences the differences in online and on-campus teaching platforms.

13

¶ 35.   Additionally, the Board determined that DLP faculty teaching exclusively online are hired and supervised differently than traditional part-time faculty.   The Board based this conclusion on its factual findings that the Associate Dean of Distance Education Programs, Bobbi Jo Carter, makes selection, retention, supervision, and evaluation determinations for DLP faculty while campus-based part-time faculty are hired and supervised by their respective academic departments under the direction of the provost's office.

¶ 36.   In determining that exclusively online and part-time on-campus faculty did not share an adequate community of interests, the Board also "look[ed] at the broad picture of what is happening in higher education."   The Board explained that the DLP and the faculty teaching in that program "are part of a development that is in large part either disrupting or displacing the current campus-based model."   The Board stated that because of this shift in the educational landscape, "[m]any of the competitors of the [DLP] have no affiliation with campus-based services" and the "interests of the part-time campus-based faculty and the distance learning faculty exclusively teaching online courses differ."   As such, placing both groups in the same bargaining unit would make it difficult for either to be represented effectively or negotiate as a single entity. As evidence of this, the Board highlighted the different compensation considerations between the DLP and campus-based groups, explaining that "data suggest[] that distance learning will grow and that soon the majority of faculty will be non-Vermont based."   The Board noted:

> Although Vermont-based distance learning faculty are paid at the same credit rate as the members of the part-time faculty unit, the increasing number of distance faculty living out of state results in geographic pay differentials being an issue with respect to [DLP] faculty but not for members of the part-time faculty unit.

Therefore, separate bargaining units would be beneficial when negotiating compensation concerns, due to the competing interests involved.

¶ 37.   In sum, the Board determined that these two groups did not share a community of interests because "there are student differences, courses designed and implemented in a

14

substantially different manner, separate hiring and supervision, different compensation considerations, and no evident interaction among the distance learning faculty exclusively teaching online courses and the members of the part-time faculty unit."

¶ 38.   The factors considered by the Board align with—and supplement—the community-of-interests factors required by § 941(f) and Board precedent.[4]  Here, the Board's numerous factual findings illustrating the differences between the two faculty groups amply support the Board's conclusion that part-time DLP faculty and part-time on-campus faculty in the existing bargaining group do not share an adequate community of interests.  Applying the highly deferential standard of review afforded to decisions within the Board's expertise, such as this one, we affirm the Board's conclusion that including these two groups in the same bargaining unit would not constitute an appropriate unit.  Accordingly, we affirm the Board's dismissal of the Federation's petition.

¶ 39.   The Federation contends that certain factual findings made by the Board were erroneous, and therefore do not provide a basis for the Board's conclusion and dismissal of the petition.  The Federation specifically challenges the Board's findings: (1) that students who take online courses differ from students taking on-campus courses and that any difference in student population is relevant to the Board's community-of-interests analysis; and (2) that the teaching experience for DLP and on-campus faculty is meaningfully different.  We disagree.

¶ 40.   The Board's undisputed factual findings reflect data and statistics from the testimony and exhibits before the Board at the hearing.  This data demonstrates that DLP and traditional on-campus faculty teach courses with different student compositions; host classes from

---

[4]  Section 941(f)(2) requires that the Board consider the "similarity or divergence of the interests, needs, and general conditions of employment" of the part-time DLP and campus-based faculty; Board precedent requires the Board to consider the "differences and similarities in method of compensation, hours of work, employment benefits, supervision, qualifications, training, job functions, and job sites."  See supra, ¶ 30 (outlining what Board must and may consider in determining whether community of interests exists).

different locations; go through a different hiring process directed by Associate Dean Carter; receive different training, evaluations, and compensation packages; and generally utilize different teaching platforms, among other findings. These findings support the Board's statements that the students who enroll in DLP courses often differ in age, background, and the type of educational experience they seek (on-campus or online) from the traditional on-campus students, and that online faculty have a different teaching experience. Because the Board's findings (that students and faculty in the DLP program have a "significantly different experience" than students and faculty in the traditional on-campus program) are supported by the evidence, we find no error.

¶ 41. The Federation asserts that "customer base" (student population) is not a relevant factor in the Board's community-of-interests analysis because any difference in student population is immaterial to the experience and employment conditions of the faculty. While the Board is not required to look at student population in making its decision, the language of § 941(f) is permissive—it list factors that the Board must look to when determining whether a community of interests exists, but it does not prohibit the Board from considering other unlisted factors. Additionally, the factors generally considered by the Board broadly look to "differences and similarities in job functions" to determine whether a community of interests exists. See supra, ¶ 30. Nothing prevents the Board from considering student population in that analysis.

¶ 42. The Federation also claims that certain Board findings are unsupported by the evidence. Specifically, the Federation contends that: (1) there is no evidence to support the Board's claim that DLP courses are designed and presented in a substantially different manner than campus-based courses; (2) the record does not support the Board's finding that there are significant differences between faculty experiences based on the use of Moodle; (3) there is no evidence in the record that DLP and campus-based faculty have different practices regarding response times to emails and assignments; and (4) the Board's finding that DLP faculty are hired directly by Associate Dean Carter is "incorrect" or "misleading." The Federation argues that

16

without these factual findings, the Board's determination that DLP and on-campus faculty have a significantly different faculty experience is unsupported. We disagree with the Federation because the testimony and evidence before the Board support its findings.

¶ 43. Regarding the creation and structure of DLP courses compared to on-campus courses and the faculty's use of Moodle, the Board heard testimony from Associate Dean Carter, Dean of Administration Sharron Scott, and VSC faculty member (teaching online and on-campus courses) and VSC Faculty Federation President Lisa Cline, clarifying that DLP and on-campus courses are designed and implemented differently and that the prevalence of Moodle use differs between the faculty populations. Although the content may be the same between some online and on-campus courses, Associate Dean Carter directly testified that DLP courses are "designed differently," with "very specific guidelines regarding the course structure and navigation." For example, DLP faculty are required to use Moodle for online instruction and to "facilitate" the written student discussions on the Moodle platform. On-campus faculty may utilize the Moodle platform, but they are not required to do so. Ms. Cline, who teaches both on-campus and online courses, testified that "[a]synchronous discussions," held online over the course of a span of time, "are different from in-class discussions." Though she felt the difference was insignificant when the course content was the same, she agreed with VSC's counsel that facilitating an online dialogue differs from facilitating an in-person, on-campus dialogue because "it feels different when you're sitting in the room with [the students]; you can read [their] facial expressions." Associate Dean Carter estimated that "under fifty percent" of classroom-based courses utilized Moodle; even when they did, it might only be for grading or detecting plagiarism, rather than for full course administration as DLP instructors are required to do.

¶ 44. The Board also heard testimony regarding and reviewed a copy of the DLP Policies and Procedures Handbook, which was designed by Associate Dean Carter. As Associate Dean Carter explained, "[d]istance learning, all of the courses and all of the instructors[,] fall under one

17

umbrella." She specifically created the DLP Programs and Policies Handbook for DLP administrators and faculty so that there were "written policies" regarding "how the distance learning programs [are] designed and what the expectations [are] for faculty members," which are separate from the guidelines for on-campus faculty. In addition to the handbook and the use of Moodle, DLP faculty are required to use a specific template when designing their individual courses. While on-campus faculty may utilize a similar template, Associate Dean Carter explained that "it isn't [the template used by DLP faculty]." Contrary to the Federation's assertions, this evidence supports the Board's factual findings that DLP courses are designed and presented in a substantially different manner than campus-based courses and that Moodle is used differently by DLP and on-campus faculty, resulting in significant differences between faculty experiences.

¶ 45. Similarly, we disagree with the Federation's contention that the Board lacked evidence to find that DLP and campus-based faculty have different experiences based on expectations regarding response times to emails and assignments. As with Moodle, Associate Dean Carter testified that DLP faculty are required to respond to emails within forty-eight hours and to assignment submissions within one week; she did not know what the on-campus faculty requirements were. Ms. Cline confirmed that on-campus faculty do not have set requirements for their response times, but on-campus teachers adhere to similar expectations for professionalism in communications. In sum, DLP faculty are required to practice responsiveness in a certain way, while on-campus faculty generally maintain a similar practice by choice. Although the result may look similar (teachers responding to students in a timely fashion), the Board's findings that the program requirements differ and that that difference affects the faculty experience is supported by the record.

¶ 46. Finally, the Federation challenges the Board's finding that Dean Carter directly hires DLP faculty, arguing that it is "incorrect" or "misleading" and not supported by the evidence. We disagree. Associate Dean Carter described her position and the DLP's hiring structure during

18

her testimony. Notably, when asked about the DLP faculty who she hires, Associate Dean Carter explained that:

> I have a pool of instructors from whom I have collected credentials and verified that they have the credentials necessary to teach . . . in specific course areas. Then when I go through and identify the courses that are going to be taught in a specific semester[,] I also identify the instructors who either have taught the course before or, if it's a brand-new course for which we've never had an instructor, the people who have credentials in that area and may be able to teach that. If the individual who's taught the course before . . . received good evaluations and they have the credentials and everything, they get priority. If, on the other hand, it's a brand-new course that no one has ever taught before or that the previous instructor no longer wants to teach . . . , I send the credentials to the campus department chair and request feedback regarding who of the individuals is qualified to teach the course.

After Associate Dean Carter identifies someone who may be a potential instructor for a course, she sends that person's credentials to the campus-based office to determine whether the potential hire, in fact, has the appropriate credentials. However, "that's the only involvement with the hiring the campus has." This process is reaffirmed by the DLP Policies and Procedures Handbook, which states: "[DLP] instructors . . . are hired on an adjunct basis per semester to teach specific courses as assigned. The hiring process begins with the creation of a faculty profile that is provided to the appropriate Department Chair . . . to be approved for teaching specific courses." While the campus office and Department Chair verify credentials and give final hiring approval, Associate Dean Carter identifies, screens, and selects faculty for the DLP. Based on this evidence, the Board did not err in finding that Associate Dean Carter directly hires DLP faculty because "the ultimate decision to select an individual to teach a particular distance learning course is made by Associate Dean Carter."

¶ 47. On appeal, it is not our role to reweigh the evidence. Lichtenberg v. Office of Prof'l Regulation, 2009 VT 105, ¶ 10, 186 Vt. 641, 987 A.2d 322 (mem.). If the Board's findings are

19

supported by the evidence, then we will uphold them. New Eng. Police Benevolent Ass'n, 2015 VT 51, ¶ 6. Such is the case here.

¶ 48. In addition to its challenges to specific Board findings, the Federation points to the similarities in content and hiring practices—that were undisputed and which the Board allegedly overlooked—to demonstrate that part-time DLP and on-campus faculty have overlapping concerns. The crux of the Federation's challenge is that because some evidence before the Board demonstrates overlap between these two faculty groups, the Board must determine that combining these groups creates an appropriate bargaining unit. However, the test to determine whether a community of interests exists is not whether any similarities exist between the two faculty populations. Rather, the question before us is whether the findings of fact support the Board's conclusion that these two groups do not share adequate similarities to create a community of interest. Whether the Federation would have interpreted the facts differently than the Board is irrelevant.

¶ 49. Here, the Board's factual findings demonstrate that DLP faculty and on-campus faculty have different student populations, geographic locations, faculty experiences and teaching platforms, administration and hiring practices, and compensation considerations. Additionally, the Board found that the two groups have minimal interactions, that—due to the increase in distance learning—they are inherent competitors, and that new issues for online educators not shared by traditional faculty will arise in the near future. All of these findings support the Board's conclusion that there are sufficient differences in the interests between these two groups that combining them would result in an inappropriate collective-bargaining unit.

¶ 50. In addition to concluding that the petitioned-for unit would be inappropriate for the reasons listed above, in its October 2018 amended order the Board analyzed whether adding DLP faculty "who teach both online courses and campus-based courses" to the existing part-time faculty bargaining unit would be appropriate. The Board concluded—in dicta—that "a separate unit of

20

distance learning faculty exclusively teaching online is an appropriate unit, and an appropriate unit also results if part-time faculty teaching both on-line and on campus based courses are added to the existing part-time faculty unit," but it did not order an election for such a unit. The parties both contend this conclusion by the Board is in error and would result in over-fragmentation.

¶ 51. In light of the Board's dismissal of the petition, the issue of whether the subgroup of DLP faculty highlighted by the Board—those who teach both online and campus-based courses—share an adequate community of interests with the existing part-time faculty group is not properly before us. It would be advisory in nature for this Court to speculate whether dividing DLP faculty into two subgroups and different bargaining units would result in an appropriate unit when the Board's dismissal is not based on this reasoning and this question is not a "necessary part of the final disposition of the case." Wood, 135 Vt. at 121, 370 A.2d at 192 (explaining that for Court to reach issue, "[t]he question submitted must not be premature, in that it must be a necessary part of the final disposition of the case to which it pertains"). The Board's musings regarding what might constitute an appropriate unit has no bearing on its conclusion that the petitioned-for unit was inappropriate. Accordingly, we decline to address this issue.

¶ 52. As recognized by the Board in its final order, the Federation may file a new petition with the Board seeking to form a collective-bargaining unit. 3 V.S.A. § 941(c)(1). In response to the parties' briefing, we note that the Board's initial order from May 2018, to which VSC advocates a return, is not before us on appeal. In that order, the Board determined that the petitioned-for unit was inappropriate and responded to the Federation's petition by creating a new, standalone bargaining unit for all part-time DLP faculty. We affirm the Board's dismissal in its October 2018 amended order based on the Board's conclusion that the Federation's petitioned-for unit was inappropriate. This is not to suggest that a petition for a standalone DLP unit, such as the one outlined in the Board's initial order, might not be successful. Similarly, we do not address whether

21

a split unit such as the one outlined in the Board's August and October 2018 amended orders, to which both parties objected, would survive over-fragmentation concerns.

Affirmed.

FOR THE COURT:

_____

Associate Justice